Raymond G. COOPER, Jr., Plaintiff,

v.

CAPE MAY COUNTY BOARD OF SO-
CIAL SERVICES, Director Joseph B.
Fahy, Administrative Supervisor,
Edna Hand, John Doe Decision Mak-
ers, (Plural 1–10), Defendants.

No. CIV. 00–CV–0050 (SSB).

United States District Court,
D. New Jersey.

Nov. 27, 2001.

Richard L. Press, Press & Long, P.A., Northfield, NJ, for Plaintiff Raymond Cooper, Jr.

Robert A. DeSanto, Gruccio, Pepper, Giovinazzi, DeSanto & Farnoly, P.A., Vineland, NJ, for Defendants Cape May County Board of Social Services, Director Joesph B. Fahy, and Administrative Supervisor Edna Hand.

## OPINION REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BROTMAN, District Judge.

### I. *Introduction*

This case involves allegations by Raymond G. Cooper, Jr. ("Plaintiff") of workplace retaliation and loss of a promotion in

violation of 42 U.S.C. § 1983 and the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19–1 *et seq.* ("CEPA"). Presently before the Court is the Motion for Summary Judgment of Defendants Cape May County Board of Social Services (the "Board"), Director Joseph B. Fahy ("Mr.Fahy"), and Administrative Supervisor Edna Hand ("Ms.Hand") (collectively "Defendants") seeking to dismiss this action. The Court has jurisdiction pursuant to 42 U.S.C. § 1331 over Plaintiff's First Amendment claim under 42 U.S.C. § 1983 and also has supplemental jurisdiction pursuant to 42 U.S.C. § 1367 over Plaintiff's state law CEPA claim. For the reasons stated below, Defendants' Motion for Summary Judgment will be *granted* in part.

## II. *BACKGROUND*

### A. *The Parties*

Plaintiff Raymond G. Cooper is currently employed as a Clerk at the Cape May County Board of Social Services. (Pl. Compl. at ¶ 1). Defendant Cape May County Board of Social Services is a public agency in the State of New Jersey charged with administering welfare benefits and social services programs throughout Cape May County. (Pl. Compl. at ¶ 2); (Dep. of Joseph B. Fahy, Def. Br.App. M, at 11) ("Fahy Dep."). Defendant Joseph B. Fahy is the Director of the Cape May County Board of Social Services and has direct authority for the hiring and promotion of Board of Social Services Employees in accordance with regulations outlined by the New Jersey Department of Personnel. (Pl. Compl. at ¶ 3); (Fahy Dep. at 11). Defendant Edna Hand is an Administrative Supervisor of Income Maintenance with the Medicaid Unit of the Cape May County Board of Social Services, and is responsible for overseeing the administration of Medicaid programs throughout Cape May County. (Pl. Compl. at ¶ 4); (Def.'s Answer at ¶ 4);

(Dep. of Edna Hand, Def. Br.App. L, at 10) ("Hand Dep.").

### B. *Factual and Procedural Background*

In this action, Plaintiff alleges that Defendants denied him a promotion to the position of Income Maintenance Technician in retaliation against him for complaints he made to the New Jersey Department of Personnel regarding a co-worker, Ms. Donna Bright.

On or around December 1994, Plaintiff started working for the Cape May County Board of Social Services ("Board") as a maintenance employee as part of a welfare community work experience, or "reach" program. (Dep. of Raymond Cooper, Def. Br.App. K, at 14–15) ("Cooper Dep."), which placed him in the position as a condition of his receipt of welfare benefits. (Cooper Dep. at 15). On or about April 3, 1995, Plaintiff was hired as a Senior Telephone Operator on a temporary basis to fill in for a disabled employee who was in the hospital. (*See* Pl. Stmt. of Uncontested Facts at 4);(Cooper Dep. at 17). With the help of Mr. Fahy, Plaintiff was then hired on or about October 2, 1995 as a permanent Clerk within the Fiscal Unit. *Id.* The job description of Clerk, an entry level noncompetitive position, involves performing "routine, repetitive, clerical work of a varied nature," including a "relatively small proportion of difficult tasks." (*See* Pl.App. Ex. V).

Plaintiff's duties as a Clerk included mail sorting and distribution, telephone coverage, stuffing envelopes, and the transport of checks and food stamps. (Fahy Dep. at 34). In addition, he also performed maintenance and janitorial work, including the repair of rugs and tiles, moving of equipment, wiring for equipment, and the keeping of maintenance records for Board vehicles. (Cooper

Dep. at 36–37). The decision to split Plaintiff's responsibilities between the Clerk and maintenance positions stemmed from Plaintiff's "serious limitations" in his ability to perform the duties expected of the Clerk position. (Fahy Dep. at 34–35). He could not perform bookkeeping functions and had difficulty with filing documents. *Id.* Although he was officially a Clerk, he performed only thirty percent of the duties associated with the position and focused primarily on maintenance, because his position had been created and "pieced together" to help transition Plaintiff into the work force as a part of welfare reform. (Fahy Dep. at 34–37). During this time, the Board was planning to relocate its offices, was involved in the construction of a new building, and Plaintiff helped to support the relocation effort.

The first day of operation in the Board's new facilities was on or about June 24, 1996. In the months that followed the move, Plaintiff continued splitting his time (Cooper Dep. at 38) working under the direct supervision of Ed Selnick, a Fiscal Officer within the Fiscal Unit, and also occasionally performing duties for Mr. Jim Hersh, who had previously been his supervisor when Plaintiff worked as part of the reach program. (Fahy Dep. at 35, 54–56).

### 1. *Plaintiff's Interaction with Donna Bright*

On February 18, 1997, Ms. Donna Bright ("Ms.Bright") was hired within the Fiscal Unit as a Confidential Clerk reporting directly to Ed Selnick. (Plt'f's Stmt. of Uncontested Facts at 4), (Def. Answer at ¶ 3). Sometime thereafter, Mr. Fahy decided to employ Ms. Bright in the capacity of an Office Manager, and, accordingly, she was given additional responsibilities. (Fahy Dep. at 58–59). Her primary duty was to ensure adequate coverage within the Fiscal Unit. Mr. Fahy communicated this decision to Plaintiff and everyone within the office, even Ed Selnick, who routinely referred Plaintiff to Ms. Bright when administrative issues arose, such as requests for administrative leave, vacation time or the distribution of work assignments. (Cooper Dep. at 44–46). Plaintiff stated that he first learned of Ms. Bright's designation as Office Manager toward the end of 1997 when he started getting his time slips back with her signature on them and when she asserted supervisory authority over clerks within the Fiscal Unit regarding the approval and denial of time. (Dep. of Raymond Cooper, Def. Br. Ex. J at 29–30) ("Cooper II Dep.").

Problems between Plaintiff and Ms. Bright began shortly after she assumed her office management duties. Plaintiff's splitting of his responsibilities working for Ms. Bright and Jim Hersh proved to be problematic and caused friction between her and Plaintiff. Ms Bright gave work to Plaintiff and then he would be called out to assist Mr. Hersh. (Cooper Dep. at 52). Plaintiff stated that Ms. Bright informed the three women clerks with whom he worked that they were not permitted to help Plaintiff with his workload *Id.* at 52–53, and as a result, upon returning from his maintenance duties, he was behind in his work and wondered why no one would assist him. Plaintiff contacted both his union and Mr. Fahy and told them he "didn't want to do maintenance anymore cause he was hearing slack from the room" *Id.* at 59., and he was subsequently assigned to work exclusively within the Fiscal Unit. *Id.* at 55–56. Plaintiff maintains, however, that even after his assignment, Ms. Bright continued to make sly remarks to him. *Id.* at 58.

Plaintiff also alleges that he was routinely treated differently from the other women clerks who worked in the Fiscal Unit and that he suffered gender discrimination, stating "I don't know if she like men or what." (Cooper Dep. at 58–59). He

contends that the other girls "could sit there and talk about shoe sales and shopping sprees," and he would be given more work to do when he was already busy. *Id.* at 59–60. "They got time off without a hassle; I didn't. And she would take and put me on the phone, knowing I had things that I had to get done, and not the girls." (Cooper II Dep. at 81). She would also say things such as, "You don't have enough to do? Go over and file." (Cooper Dep. at 59–60).

Plaintiff maintains that he was denied overtime opportunities involving food stamp distribution. *Id.* at 51; (*See* Ltr. from Plt'f. to Mr. Fahy, dated May 6, 1998, Def. Br.App. B) ("Cooper Letter"). He also complained that Ms. Bright suspected him of having stolen food stamps and would come over to his desk, thinking that he "had them stashed around there or something." *Id.* During this time, incidentally, the fraud unit of the Board had been conducting an investigation of disappearances of food stamp coupons, which resulted in the discovery that two postal employees were involved in the theft. (Fahy Dep. at 112).

Plaintiff sought out his union representatives, Jean Monihan and Judy Ladd, and asked them "how a clerk typist can tell the office staff what to do" *Id.* at 61, and also asked them to file a formal grievance. They refused, however, stating that because Ms. Bright was appointed to the position, "there was nothing they could do about it." *Id.* In addition to this specific complaint to his union representatives, Plaintiff complained to the union several other times regarding his treatment by Ms. Bright and her attitude and demeanor not only towards him, but also toward his co-workers. (Cooper II Dep. at 93). It was generally acknowledged, however, that Ms. Bright was "not an easy person," was "sharp in her dealings with anyone," and was "abrupt." (Fahy Dep. at 60).

Aside from the general friction between Plaintiff and Ms. Bright, the first significant incident occurred on or about February 5, 1998, when Plaintiff telephoned the office to leave a message for Ms. Bright informing her that he would be absent from work that day because his son was sick. *Id.* at 37. When Plaintiff arrived to work the next day, Ms. Bright told him he would have to take administrative time, in lieu of a sick day. *Id.* When asked why, she told him to take up the time classification matter with Mr. Fahy. *Id.*

Plaintiff was again denied administrative leave on March 3, 1998 when he asked Ed Selnick for the afternoon off to have the tires on his car replaced because one was "ready to blow." (Cooper II Dep. at 35–36), (Cooper Dep. at 45). Although Mr. Selnick permitted Plaintiff to take the afternoon off, Ms. Bright later denied his request, despite Plaintiff's explanation of the situation. *Id.*

On April 24, 1998, Plaintiff was formally reprimanded after an incident involving the postage meter on the postal machine. Plaintiff left a note on Ms. Bright's desk informing her that the postage meter required replenishment for an upcoming bulk mailing. (Cooper II Dep. at 50–53). The postage meter was normally maintained at an amount of $1500, but had been substantially depleted. Plaintiff, who had been out of the office the day before, was held responsible for this event, which resulted in a formal letter of reprimand dated April 29, 1998 being placed in his file. *Id.* at 50–55; 62. Plaintiff was upset because he had nothing to do with the depletion of postage on the machine, having simply informed her of the need to add postage to the meter. The letter of reprimand also addressed a number of other matters, including employee lunches and an incident where Plaintiff forgot to put out new time cards in time for the other

employees. *Id.* at 62; (*See* "Cooper Letter").

After the postage incident, Plaintiff went to the Union and Mr. Fahy regarding Ms. Bright's exercise of supervisory authority over him, specifically regarding the letter of reprimand. *Id.* at 53. Mr. Fahy declined, however, to remove the letter from his file. *Id.* Plaintiff then went further, and on April 30, 1998, contacted and met with Mr. Anthony L. Gricco ("Mr.Gricco"), a Human Resource Management Consultant with the New Jersey Department of Personnel ("New Jersey DOP" or "DOP"). In this meeting, Plaintiff addressed his problems concerning Ms. Bright. He told Mr. Gricco of the treatment he received, the denial of days off, her general tone and demeanor, and repeated his allegations of gender discrimination. (Cooper II Dep. at 65–66). Plaintiff also informed the union and his co-workers about his contact with the DOP. *Id.* at 147–48. He stated that Mr. Gricco explained to him that Mr. Fahy would be advised that Ms. Bright could not work in that capacity because of her job title. *Id.* at 66.

Shortly after Plaintiff's conversation with Mr. Gricco, Mr. Gricco spoke to Mr. Fahy regarding Plaintiff's situation. Mr. Fahy testified that "I explained [to Mr. Gricco] what I was trying to accomplish [regarding the functioning of the Fiscal Unit] and he told me what she [Ms. Bright] could and could not do in that position, so that I implemented those changes prior to the receipt of the letter [1] which was a couple of months later." (Fahy Dep. at 61).

On May 6, 1998, Plaintiff sent a letter to Mr. Fahy echoing his earlier complaints and grievances. The letter reiterated the above allegations and incidents of unfair treatment from Ms. Bright, the denial of leave and overtime opportunities, and his general malaise at having to work with her. (*See* Cooper Ltr.). Plaintiff stated that the situation "has only gotten worse and feel that legal action may become necessary to protect my future with this agency." *Id.*

Following Plaintiff's contact with Mr. Fahy and Mr. Gricco and into the summer of 1998, Plaintiff's situation worsened. He stated:

> Well, she [Ms. Bright] started putting me on the phone a lot, lot more to—and then I couldn't get my work done. What else? I took on other people's— like I started doing stuff that Janet used to do. I started doing stuff that Janet used to do. The Medicaid things that I would help out on now became mine. If I didn't get to 'em—I used to do them when I had time, I would help Janet out, and now it was mine. So they would pile up until I got time to get to 'em and then I'd have stacks of 'em.

Cooper II Dep. at 82–83.

Plaintiff's time off requests continued to be authorized by Ms. Bright. However, she used a rubber stamp that contained Mr. Fahy's signature, a change that Mr. Fahy instituted in response to his phone call with Mr. Gricco. *Id.* at 75; (Fahy Dep. at 62) Ms. Bright would consult with him regarding the grant or denial of time off and she would then use the rubber stamp accordingly. *See id.*

During this time, Plaintiff complains that Ms. Bright's attitude towards him worsened, that it was "time to get even with Ray or something like that," and that his boss, Ed Selnick, warned him on several occasions to "be careful" and to "watch his back." (Cooper II Dep. at 78–79). Plaintiff also repeatedly requested to be

---

1. This refers to the letter dated September 4, 1998 from Mr. Gricco to Mr. Fahy regarding Ms. Bright's exercise of supervisory authority over Plaintiff, discussed *infra.*

transferred out of the Fiscal Unit but no position was available. (Fahy Dep. at 67).

Finally, on September 4, 1998, Mr. Fahy received a letter from Mr. Gricco at the New Jersey DOP regarding his meeting with Plaintiff, wherein he addressed Plaintiff's concerns about Ms. Bright. (*See* Def. Br. at Ex. B). This letter states in pertinent part:

> As you are aware, I was contacted by Mr. Raymond Cooper, Clerk, regarding his perception of unfair treatment. I met with Mr. Cooper, reviewed his personnel folder and listened to his concerns. Based on this meeting, I would like to make some suggestions. Mr. Cooper provided me with copies of Leave Request forms signed by Ms. Donnalee Bright. Our records indicate that Ms. Bright is a Clerk Typist and thus would have no supervisory responsibility for Mr. Cooper. Mr. Cooper also provided me with a copy of a memo written by Ms. Bright in which she assumes the title of Office Manager, a title she does not hold. Please ensure that Ms. Bright does not assume supervisory responsibility for Mr. Cooper or any other member of the staff in the future.

The letter further states:

> As we discussed, Ms. Bright can be used for duties involved with the dissemination of work and the collection of same. However, any corrective action necessary with the completion of work should

be referred to the legitimate supervisor of the unit. I explained that the Department of Personnel only becomes involved with disciplinary matters at the Major Discipline level, and that my involvement in this issue was only one of a concern for proper classification of the individual using supervisory powers.

(Ltr. from Anthony L. Gricco to Joseph B. Fahy, dated Sept. 4, 1998 at Def. Br. at Ex. B).

As stated earlier, Mr. Fahy revised Ms. Brights duties in response to the concerns Mr. Gricco. Plaintiff did however, continue to receive work assignments through Ms. Bright. (Fahy Dep. at 63).

### 2. Plaintiff's Application for the Income Maintenance Technician Position

In the summer of 1998, Plaintiff applied for the position of Income Maintenance Technician [2] (IMT), an open and competitive position within the New Jersey Civil Service system. The job description states that an IMT performs, inter alia, "a variety of non-complex tasks of a technical, financial nature related to determining eligibility for public assistance." (*See* DOP Job Specification 02089, Def. Br.App. Ex. H). As a condition to establish eligibility, a candidate must first meet the qualifications [3] and take a competitive examination to be appointed to a list ranking eligible candidates based on exam performance.

---

**2.** The New Jersey Department of Personnel subsequently changed the title of this position to Human Services Specialist. The duties remain the same. (*See* Fahy Dep. at 70). For purposes of this Opinion, the title will be referenced as Income Maintenance Technician, or IMT.

**3.** The IMT position requires:

> Two (2) years of experience involving either: (1) securing/verifying information and making determinations or recommendations pertaining to such matters as eligibility or qualifications of applicants for

loans, insurance, credit, or entitlement to cash awards of financial benefits or adjustment and settlement of insurance claims; (2) investigations which involve collection of facts and obtaining information by observing conditions, examining records, interviewing individuals, and preparing investigative reports of findings; or (3) investigating, establishing, and/or enforcing support obligations in a welfare board or agency, court system, or related agency.

(*See* DOP Job Specification 02089, Def. Br. App. Ex. H).

On or around July 27, 1998, Plaintiff submitted his resume and an application to the New Jersey DOP and took the exam.[4] (*See* Pl. Br. Ex. A). His exam score placed him in the number 11 position on a list of 18 candidates, (*See* Pl. Br. Ex. D) and, on or around September 21, 1998, he expressed his interest in the job to Mr. Fahy. (*See* Pl. Br. Ex. C). What transpired after these events, however, is disputed between the parties.

Plaintiff contends that he was repeatedly passed over for consideration for the IMT position and maintains that Defendants failed to properly utilize disposition codes identifying Plaintiff's current status as a candidate. He further alleges that Defendants placated him by carrying his name over to subsequent eligibility lists, all the while never intending to hire him despite his contention that he is qualified. Moreover, Defendants never advised him that he lacked the necessary qualifications for the IMT position. (*See* Pl. Br. Ex. K). Plaintiff asserts that Defendants' contention that he was not qualified is a "post-hoc rationalization," that the reasons for continually bypassing him are "pretextual," and that the real reasons are that he was "being punished for having exercised his right to assert a valid complaint with the New Jersey DOP." (Pl. Br. at 2).

As late as October of 1998, however, Plaintiff was scheduled to interview for the IMT position (*See* Pl. Br. Ex. L) and interviewed with Ms. Hand on October 22, 1998. In the interview, Plaintiff states that Ms. Hand "brought up me calling the state about Donna Bright." (Pl.Br.Ex.R). When Plaintiff asked about his chances for the position, she stated "everything was good, except the only thing she seemed to think would be a problem was the trouble you caused with Donna Bright by calling the state." (Pl. Br. Ex. R). Ms. Hand testified that she interviewed Plaintiff only as a courtesy and never thought him to be qualified for the position. (Hand Dep. at 21–24). Mr. Fahy also stated he "did not intend to interview Mr. Cooper and that the interviewers knew that he considered Plaintiff not be qualified." (Fahy Dep. at 41). He allowed the interview to take place as "a courtesy." *Id.* Plaintiff later received a letter dated December 17, 1998 from Mr. Fahy thanking him for his interest in the IMT position but informing him that his application was not able to be considered at that time. (*See* Pl. Br. Ex. S). His name, however, was retained on the eligibility list. *Id.*

On December 2, 1998, Plaintiff e-mailed Governor Christine Todd Whitman, seeking information regarding Defendants' failure to consider his application. On December 14, 1998, Janice Mitchell Mintz, Commissioner of the New Jersey DOP responded to Plaintiff, confirming his rank of number 11 and informing him that the list upon which he was placed was to remain available for use until August 26, 2001. (*See* Pl. Br. Ex. JJ). Plaintiff continued to work as a Clerk within the Fiscal Unit.

On September 28, 1999, the Board initiated disciplinary action against Plaintiff for a comment he made in the presence of co-workers the day before, which caused them to fear for their safety. (Def.Br.Ex.D). Plaintiff, while talking with co-workers about an explosion at a

---

**4.** In answers to interrogatories, Plaintiff's educational experience indicates that he finished the 11th grade and took the GED for the 12th grade. He has also engaged in the following occupations prior to working for the Cape May County Board of Social Services: Truck Driver; Movie Theater Usher; Laborer and various maintenance positions; Mason and various construction related jobs; and as a Bouncer and Bartender. (*See* Def. Br. Ex. I, qu.20); (Pl.Br.Ex. A).

nearby building, mentioned how "he hated this place" and said something about "going postal." (Cooper II Dep. at 133–36). Plaintiff contends this was a joke amongst him and his co-workers, stating that he used to joke about the fact that he regularly worked with the mail and " 'cause mail guys go postal all the time.' " *Id.* at 135. Plaintiff, however, was immediately escorted off the premises and the Board initiated a formal investigation. *Id.* at 136. Plaintiff was suspended with pay until completion of an investigation and evaluation. (Def.Br.Ex.D).

In lieu of a formal departmental hearing, Plaintiff and the Board reached an agreement wherein Plaintiff returned to work on November 23, 1999 and was required to enroll in a treatment program for stress and anger management. (Def.Br.Ex.E). On December 8, 1999, the New Jersey DOP sent Plaintiff a Final Notice of Disciplinary Action. (Def.Br.Ex.F). Plaintiff ultimately received a three day suspension without pay and was required to undergo counseling. (Cooper II Dep. at 137).

On January 3, 2000, Plaintiff filed a two-count complaint alleging that Defendants retaliated against him for having exercised his First Amendment rights by complaining to the New Jersey DOP about Ms. Bright working beyond the scope of her job title. He claims that Defendants violated 42 U.S.C. § 1983 and the New Jersey Conscientious Employee Protection Act, N.J.S.A. 34:19–1 *et seq.* (CEPA). Plaintiff continued to express interest, however, in the IMT position and again wrote to Mr. Fahy on April 4, 2001. (Pl. Br.Ex.F).

On July 3, 2001, Mr. Fahy sent a letter to the DOP asking them to remove Plaintiff from the list of eligible candidates for the IMT position (*See* Pl. Br. Ex. H), asserting that Plaintiff lacked the necessary educational and experience requirements.[5] *Id.* Apparently, Plaintiff had been removed from the eligibility list on or around March 28, 2001 and the disposition code "L1," which indicates a removal for lack of qualifications, was placed next to his name. (Pl.Br.Ex.E, G); (*See also* Def. Reply Br. Ex 1).

On August 9, 2001, Plaintiff's counsel sent a letter on behalf of Plaintiff to the New Jersey DOP to ascertain Plaintiff's status on the IMT eligibility list. He received a response from the DOP on September 5, 2001, informing him that Plaintiff had been removed from the list because he lacked the minimum requirements for the position. (*See* Def. Reply Br. Ex 1). Plaintiff's removal from this list is currently on appeal and pending before the New Jersey DOP, Merit Systems Practices and Labor Relations; to date, no decision has been rendered. (*See* Ltr. From Richard L. Press, Esq, dated Nov. 15, 2001). Plaintiff still contests Defendant's assertion that he has been "deemed not qualified to fill" the position and because there has been no final determination.

### III. *Summary Judgment Standard of Review*

Federal Rule of Civil Procedure 56 provides that summary judgment may be granted only when materials of record "show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Serbin v. Bora Corp.,* 96 F.3d 66, 69

---

5. Mr. Fahy stated, "In my estimation not even the most sophisticated duties contained in the Clerk job description would meet the specifications for Income Maintenance Technician and in fact, the duties that Mr. Cooper performed and continues to perform within that title are definitely at the lower end of the title." (*See* Ltr. from Joseph B. Fahy to New Jersey DOP, dated July 3, 2001, Pl. Br. Ex. H).

n. 2 (3d Cir.1996). In deciding whether there is a disputed issue of material fact, the court must grant all reasonable inferences from the evidence to the non-moving party. The threshold inquiry is whether there are "any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986).

Supreme Court decisions mandate that a summary judgment motion must be granted unless the party opposing the motion "provides evidence 'such that a reasonable jury could return a verdict for the nonmoving party.'" *Lawrence v. National Westminster Bank New Jersey*, 98 F.3d 61, 65 (3d Cir.1996) (quoting *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510). Once the moving party has carried its burden of establishing the absence of a genuine issue of material fact, "its opponent must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). A party challenged by a properly supported summary judgment motion may not merely rely on its pleadings, but must set forth specific facts—by means of affidavits, depositions, answers to interrogatories, or admissions—that show there is a genuine issue for the trier of fact to resolve. *See* Fed. R.Civ.P. 56(e); *see also Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir.1991) (declaring that non-movant may not "rest upon mere allegations, general denials, or ... vague statements"); Charles A. Wright, Arthur R. Miller & Mary Kay Kane, 10A Federal Practice & Procedure § 2721, at 364–66. The non-moving party must "make a showing sufficient to establish the existence of [every] element essential to that party's case, and on which that party will bear the burden of proof at trial." *Serbin*, 96 F.3d at 69 n. 2 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). Thus, if the nonmovant's evidence is "not significantly probative," the court may grant summary judgment. *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2511.

Before reaching the merits of Defendants' motion and Plaintiff's opposition thereto, the Court must address a procedural issue raised by Plaintiff and several noted by the Court. First, Plaintiff requests the Court to dismiss Defendants' motion because Defendants have failed to comply with the requirements of Local Civil Procedure Rule 56.1, which provides that "[o]n a motion for summary judgment, each side shall furnish a statement which sets forth material facts as to which there exists or does not exist a genuine issue." Loc. Civ. R. 56.1. From reading Defendants' submissions, it appears that Defendants have not formally complied with this Rule. Defendants' initial brief does contain a statement of facts, but they have not submitted a separate statement specifically identifying the disputed and the undisputed material facts. While failure to comply with the Rule is itself sufficient to deny their motion, the Court finds that dismissal is not warranted in this case. *See Bowers v. NCAA*, 9 F.Supp.2d 460, 476 (D.N.J. 1998) ("This failure to comply with the Local Civil Rule would by itself suffice to deny [defendant's] motion for summary judgment."); *But see Fowler v. Borough of Westville*, 97 F.Supp.2d 602, 606–07 ("Because there is no evidence of bad faith on the part of the defendants, the Court will deny defendants' motion on the merits, rather than on this procedural ground."). Accordingly, the Court will dispose of this motion on its merits rather than on a procedural ground.

■ Next, Plaintiff, in a letter dated October 29, 2001, seeks to supplement his

original opposition brief to Defendants' Motion for Summary Judgment with a printout of the case of *Marrero v. Camden County Bd. of Soc. Serv.*, 164 F.Supp.2d 455 (D.N.J.2001), a recent decision filed October 4, 2000 by the Honorable Joseph Irenas, USDJ. Plaintiff seeks to incorporate by reference pages 19 through 33 of the decision into his earlier submission. The Court will deny this request, as it considers this to be an improper sur-reply. *See Ramirez v. U.S.* 998 F.Supp. 425 (D.N.J.1998) (where party "neither requested nor received permission from the Court to submit ... a surreply," court would not consider it). Plaintiff's counsel, prior to mailing his submission to the Court, did not seek leave to supplement his earlier opposition motion, and, because he neither requested nor received the Court's permission, it will not be considered. *See* Local Civil Rule 7.1. In addition, Plaintiff has simply incorporated by reference a case allegedly distinguishable on its facts, offering no legal argument as to how, if at all, this case applies to the matter before the Court, other than to state that "lends further support to Plaintiff's opposition to dismissal of his 42 U.S.C. § 1983 claims." This type of submission, even if allowed, does not aid the Court in arriving at its decision. As a result, the Court deems the submission inappropriate and will disregard it.

Lastly, the Court notes at the outset that Plaintiff, in his original submission, has relied on an unsworn declaration in opposition to Defendants' motion for summary judgment, in contravention of the requirement of Fed.R.Civ.P. 56(e) that affidavits and other materials submitted in support of a summary judgment motion be sworn or certified. This unsworn declaration is reflected in Exhibit EE, representing notes prepared by Plaintiff concerning events that he alleges occurred at work between the dates of January 3, 1998 and February 5, 1999. Normally, the Court would refuse to consider this Exhibit on the basis that it fails to meet the requirements of Rule 56.[6] Notwithstanding this deficiency in Plaintiff's submission to Defendants' Motion, the Court finds that the evidentiary record before it is adequate for purposes of deciding this Motion. Having addressed these procedural matters, the Court now turns to Plaintiff's claims.

## IV. *Discussion*

### A. *Plaintiff's Claims under 42 U.S.C. § 1983*

█ 42 U.S.C. § 1983[7] provides a remedy for individuals whose Federal Con-

---

6. While it is true that where an unsworn written declaration has the characteristics described in 28 U.S.C. § 1746, and may have the same force and effect as a sworn declaration, this requires the maker's signed and dated statement that he does "declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing [statement of facts he has averred] is true and correct." Plaintiff's daily logs and notes concerning events that he alleges occurred at his place of employment are declarations that are not made specifically under penalty of perjury. Accordingly, these statements do not contain the requisite assurance of reliability and veracity to allow their consideration in lieu of an affidavit, and therefore cannot be considered as

part of the record of this motion. *See, e.g., United States v. Branella*, 972 F.Supp. 294, (D.N.J.1997) (Certifications containing statements, "I hereby certify that all of the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are wilfully false, I am subject to punishment." failed to acknowledge penalty of perjury, and therefore were not considered by court on summary judgment.).

7. § 1983 provides, in pertinent part:

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory ... subjects, or causes to be subjected, any citizen of the United States or other person within the

stitutional rights have been violated by persons or entities acting under the color of state law. *See McCusker v. City of Atlantic City,* 959 F.Supp. 669, 671 (D.N.J. 1996). To prevail under § 1983, a plaintiff must show: (1) a violation of a right secured by the Constitution and laws of the United States, and (2) that the alleged deprivation was committed by a person acting under color of state law. *West v. Atkins,* 487 U.S. 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988) (citations omitted).

Defendants argue that Plaintiff's constitutional claim fails because he cannot show that his complaints to the New Jersey DOP are protected free speech giving rise to a First Amendment violation. Plaintiff contends, however, that his complaints to the DOP are protected speech, entitling him to redress under § 1983.

### a. *First Amendment Retaliation Claim*

■ The First Amendment protects statements by public officials on matters of public concern. *See Pickering v. Board of Education of Township High School District 205,* 391 U.S. 563, 573, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). "[T]he Supreme Court has sought to prevent 'a State [from] condition[ing] public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.'" *Zamboni v. Stamler,* 847 F.2d 73, 76–77 (3d Cir.1988) (quoting *Connick v. Myers,* 461 U.S. 138, 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). A public employee's claim of retaliation for a protected activity, here speech, is analyzed in three steps. *Id.* (citing *Green v. Philadelphia Housing Authority,* 105 F.3d 882, 885 (3d Cir.1997); *Pro v. Donatucci,* 81 F.3d 1283, 1288 (3d Cir.1996); *Watters v. City of Philadelphia,* 55 F.3d 886, 892 (3d Cir.

1995)). First, the plaintiff must demonstrate that his speech was protected. *Id.* (citing *Green,* 105 F.3d at 885). Second, the plaintiff must show that the speech was a motivating factor for the alleged adverse retaliatory action. *Id.* Third, a defendant may defeat the plaintiff's claim by establishing that the adverse action would have been taken even in the absence of the protected speech. *Id.*

### i. *Whether the Speech Was Protected*

■ Plaintiff asserts that his complaints to the DOP regarding the Fiscal Unit's internal operations, specifically, concerning Ms. Bright's exercise of supervisory authority as a form of official administrative misfeasance, constitutes speech entitled to First Amendment protection because it implicates the important issue of employee job classifications within the New Jersey State Civil Service System, as outlined in Title 11A of the New Jersey Statutes. He further contends that the delegation of supervisory authority and classification of employees within the Civil Service System is an important issue of public concern, citing as support Mr. Gricco's involvement in Plaintiff's matter as "only one of a concern for the proper classification of the individual using supervisory power." (Def.Br.Ex. C).

Defendants contend that Plaintiff's complaints to the DOP stem from his personal dispute with Ms. Bright regarding his alleged unfair treatment and disciplinary action that he received while under her supervision. Defendant also maintains that this alleged significant relationship between Plaintiff's complaints and the statutory framework governing the DOP is tenuous and does not implicate an issue of

jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be

liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

public concern. The Court agrees with Defendants.

■ As stated above, in order to be protected, the speech in question must be on a matter of public concern. *See Connick,* 461 U.S. at 142, 103 S.Ct. 1684; *Green,* 105 F.3d at 885. A public employee's speech involves a matter of public concern if it can "be fairly considered as relating to any matter of political, social, or other concern to the community." *Green,* 105 F.3d at 885–86 (citations omitted); *see also Carlino v. Gloucester City High School,* 57 F.Supp.2d 1 (D.N.J.1999).

■ In the Third Circuit, it is well-settled that "speech disclosing public officials' misfeasance is protected while speech intended to air personal grievances is not." *Swineford v. Snyder County,* 15 F.3d 1258, 1270 (3d Cir.1994) (quoted in *Kadetsky v. Egg Harbor Township Bd. of Educ.,* 164 F.Supp.2d 425 (2001)). In *Swineford,* the Third Circuit illustrated the distinction between personal grievances and disclosure of official misfeasance by collecting cases where the criticisms of public employees were found to be matters of public concern: *Zamboni v. Stamler,* 847 F.2d 73, 77 (3d Cir.1988) (civil service employee's criticism of county prosecutor's reorganization and promotion plan); *Rode v. Dellarciprete,* 845 F.2d 1195, 1201 (3d Cir.1988) (state police civilian employee communication to reporter alleging speaker was harassed because of racial profiling); *Czurlanis v. Albanese,* 721 F.2d 98, 104 (county auto mechanic's criticism of internal management of Department of Motor Vehicles); *Trotman v. Board of Trustees,* 635 F.2d 216, 225 (professor's criticism of university president's efforts to increase faculty/student ratio).

The nature of these disputes indicates that Plaintiff's complaints about his difficulty working with Ms. Bright, her tone and demeanor towards him, her distribution of work to him, the authorization of leave, and his formal reprimand surrounding time cards and the postage machine, fails to qualify as speech touching upon a matter of public interest. Indeed, his letter to Mr. Fahy dated May 5, 1998 and the letter from the DOP to Mr. Fahy dated September 4, 1998 are evidence of the true nature of Plaintiff's grievances. Plaintiff's argument that Ms. Bright's exercise of supervisory authority over Plaintiff violated the DOP classification scheme, although creative, masks the true nature of the content of Plaintiff's speech—speech concerning personal grievances between himself and his co-worker.

The context of plaintiff's speech includes a consideration of "the whole record." *Connick* 461 U.S. at 148, 103 S.Ct. at 1691. In analyzing the issues covered in Plaintiff's meeting with the DOP, nowhere is there any indication that Plaintiff was the least bit concerned about the classification of civil service employees, other than how it related directly to his own situation. The Court agrees with Defendants when they state that "the general public does not share Cooper's concern with whether Ms.Bright is signing off on his leave requests or sending him memoranda regarding his use of a postage machine." (Def. Br. at 13).

■ As to Plaintiff's motivation, the law in this circuit is that "motivation is 'merely one factor to be considered, but [is] not necessarily controlling, in assessing the character of [the employee's] speech.' " *Zamboni v. Stamler,* 847 F.2d 73, 78 (3d Cir.1988) (quoting *Rode v.Dellarciprete,* 845 F.2d 1195, 1201 (3d Cir.1988)); *see also (Versarge v. Township of Clinton New Jersey,* 984 F.2d 1359, 1364 (3rd Cir.1993) (quoting *Connick,* 461 U.S. at 147, 103 S.Ct. 1684) ("the speaker's motivation is relevant to the extent that it indicates whether the speaker is speaking as 'a citizen upon matters of public concern' or as a

volunteer 'upon matters only of personal interest.' ")). Plaintiff's contact with Mr. Gricco immediately followed a heated incident with Ms. Bright in which she formally reprimanded him. At that time, he was motivated wholly by personal animus and self-interest because Mr. Fahy refused to remove the reprimand letter from his file.

While the Court is sensitive to the fact that complete reliance on the speaker's motivation for speaking is inappropriate, the record indicates that Plaintiff contacted the New Jersey DOP regarding very technical violations constituting trivial office matters, such as internal office procedures involving the postage machine and the proper employee signature to authorize leave. Ms. Bright's dissemination of work to him was clearly within the scope of her job responsibilities, and was subsequently approved by the DOP as consistent with her job responsibilities. The proper authorizing signature for the grant and denial of leave was promptly corrected and there is not even a hint of evidence to suggest that these issues of which Plaintiff complained relate to a matter of "political, social, or other concern to the community." *Connick*, 461 U.S. at 146, 103 S.Ct. 1684. Although Plaintiff characterizes his speech as upholding the proper classification of state employees and exposing a violation of rules which the DOP takes "very seriously" *see* Pl. Br. at 19–20, the summary judgment record indicates that Plaintiff was motivated at all times by concern for his own personal employment situation, rather than by a desire to ensure formal adherence to a statutory employment scheme or to expose wrongdoing on the part of his superiors in the name of the public good.

Plaintiff cites as controlling authority two Third Circuit cases, namely *Zamboni v. Stamler,* 847 F.2d 73, 78 (3d Cir.1988) and *San Filippo v. Bongiovanni* 30 F.3d 424 (3d Cir.1994). Plaintiff's reliance on these cases, however, is misplaced because they are either factually distinguishable or implicate other aspects of the First Amendment.

*Zamboni* involved a detective in Union County Prosecutor's Office who raised formal objections to the Prosecutor's attempt to reorganize the structure of his office including, among other things, attempting to ensure that only non-civil service employees would be eligible for further promotion. *Zamboni,* 847 F.2d at 75. Zamboni, in compliance with the reorganization plan and in hopes of being promoted, followed the new procedure outlined by the prosecutor, was ultimately passed over for promotion and instead transferred from a supervisory position to one that was non-supervisory. *Id.*

Zamboni then began to publicly criticize the reorganization plan and sought redress. Aside from writing a letter to the Civil Service Commission, complaining not only "of nonconformance to the duties and responsibilities relating to civil service job classifications," but also of the prosecutor's "purposeful attempt to subvert the Civil Service System and carry out his own plans, without regard to the law," Plaintiff sought a determination from the Civil Service Commission and appealed that determination to the Division of Appellate Practices and Labor Relations of the Department of Civil Service. *Id.* at 75–76. When he was unsuccessful there, he turned to the New Jersey Courts and asked the court for a declaration that the promotion and reorganization plan was unlawful and further sought injunctive relief canceling all promotions made under the new plan and requiring Zamboni to perform functions outside of his job title. *Id.* at 76. When he lost and that finding was affirmed by the New Jersey Appellate Division, he filed a civil rights action in fed-

eral court, alleging retaliation for exercise of his First Amendment rights. *Id.*

In analyzing the thrust of Zamboni's speech, which related to his opposition to the system-wide reorganization plan and how promotions were to be made under that plan, the Court did find that his opposition raised significant issues of public concern. Although the court concluded that the reorganization plan personally affected Zamboni and that he had an interest in its outcome, the Court also found relevant that in all of his expressions, the letter to the Civil Service Commission, his appeals to the administrative body, and in his lawsuits, Zamboni referred to this agency-wide policy issue in addition to his personal complaint. *Id.*

A review of Plaintiff's communications and contacts with Mr. Fahy, his union, and the DOP does not reveal this same concern despite Plaintiff's assertion to the contrary. (*See, e.g.* Def. Br. Ex. B, C). Plaintiff's complaints in the instant case differ from those in *Zamboni* in that they revolve around Plaintiff's personal dispute with Ms. Bright, and are only tangentially related, if at all, to the classification scheme of employees within the New Jersey Civil Service system.

■ Next, Plaintiff relies on *San Filippo v. Bongiovanni* for the proposition that a public employee is protected from employer retaliation for participating in a legal proceeding. While this is true, Plaintiff cites this case to support his argument that his freedom of speech was violated, when *San Filippo* involved the Right to Petition under the First Amendment. Plaintiff has therefore confusingly merged two separate First Amendment rights into one. A public employee's retaliation claim under the right to petition should not be subject to a "public concern" requirement. *See generally, San Filippo v. Bongiovanni*, 30 F.3d 424 (3d Cir.1994). In *San Filippo*, the Third Circuit held that a pub-

lic employee is protected against retaliation under the Petition Clause for filing a petition in the nature of a lawsuit or grievance regardless of whether the petition addressed a matter of public concern. *Id.* at 442–43. According to the Third Circuit:

> [W]hen government—federal or state— formally adopts a mechanism for redress of those grievances for which government is allegedly accountable, it would seem to undermine the Constitution's vital purposes to hold that one who in good faith files an arguably meritorious "petition" invoking that mechanism may be disciplined for such invocation by the very government that in compliance with the petition clause has given the particular mechanism its constitutional imprimatur.

*Id.* at 442; *See generally,* Rebecca A. Clar, *Comment: Martin v. City of Del City: A Lost Opportunity to Restore the First Amendment Right to Petition,* 74 Saint John's L.Rev. 483 (2000)(discussing *San Filippo* and analyzing the First Amendment Right to Petition Clause).

■ Simply put, Plaintiff's speech at issue does not implicate the Right to Petition under the First Amendment because his meeting with union representatives and Mr. Gricco at the DOP is not in the nature of a formal grievance procedure that the Petition Clause is designed to protect. Plaintiff expressed his speech in many informal settings, including letters, phone calls, and meetings with officials at the Board, his union, and the DOP. An analysis of the right to petition should "not be treated as an exercise in speech because petitioning is only marginally related to speech." *Valot v. Southeast Local Sch. Dist. Bd. of Educ.,* 107 F.3d 1220, 1234 (6th Cir.1997).

Because the Court concludes that Plaintiff has failed to raise genuine issues of material fact that his speech was a matter

of public concern and the Court's decision on this threshold issue is dispositive, it need not reach the remaining second and third prongs: (ii) whether Plaintiff's speech was a substantial cause of the alleged retaliation; or (iii) whether the removal of Plaintiff from the list of eligible candidates for the IMT position would not have occurred but for Plaintiff's speech. Accordingly, the Court will grant Defendants Motion for Summary Judgment as to all Defendants on Plaintiff's claims under 42 U.S.C. § 1983.

However, the Court notes that even if Plaintiff's speech concerning Ms. Bright exercising supervisory authority over Plaintiff could be characterized as a matter of public concern due to the comprehensive statutory framework governing civil service job classifications, Plaintiff's interest in the outcome, having Ms. Bright no longer being able to disseminate work to him or requiring him to work with her in the Fiscal Unit, is outweighed by the Board's interest in running a smooth operation and ensuring adequate coverage within the Fiscal Unit. (*See* Fahy Dep. at 58–61). Furthermore, despite the fact that Defendants retained Plaintiff on the eligibility list and granted him a courtesy interview for the position, the Court finds that Plaintiff has simply failed to raise a genuine issue of material fact as to his qualifications for the position. Plaintiff lacks the requisite experience and Defendants placed him in the unfortunate position where he thought he was qualified for the IMT position, when in actuality he was not. Defendants should be faulted, although not as a matter of law, for not having been more forthcoming with Plaintiff about their true beliefs and intentions regarding his viability as a candidate for the job, rather than have this matter end up in litigation before the Court.

## B. *Plaintiff's State Law CEPA Claim*

The Court having determined that Plaintiff has failed to raise a genuine issue of material fact on his claim under 42 U.S.C. § 1983 disposes of the federal issue in this case, leaving the remaining state law claim under CEPA, over which this court may exercise supplemental jurisdiction pursuant to 28 U.S.C. § 1367.[8]

Based on the substantial investment of time by the parties and in the interest of "economy, convenience and fairness to the litigants," the Court believes that the prudent decision is to exercise supplemental jurisdiction over Plaintiff's remaining claim under CEPA. *See, e.g., United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966). At this time however, the Court declines to rule on Defendant's Motion for Summary Judgment concerning Plaintiff's CEPA claim, as it desires to hear further oral argument, which will be scheduled for December 3, 2001 at 9:30am.

Pending the outcome of the Court's determination on this matter, the trial date previously scheduled for December 3, 2001 will be continued to a date to be determined by the Court.

## V. *Conclusion*

For the reasons stated above, Defendants' Motion for Summary Judgment will be *granted* as to Plaintiff's claim against Defendants under 42 U.S.C. § 1983. The

---

**8.** 28 U.S.C. § 1367 provides, in relevant part:
    (a) Except as provided in subsections (b) and (c) or as expressly provided otherwise by Federal statute, in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

748

Court will retain jurisdiction over Plaintiff's state law claim under CEPA and will hear oral argument on that portion of Defendants' Motion to dismiss Plaintiff's CEPA claim. An appropriate order will be entered.

### ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

This matter having come before the Court on Defendants' Motion for Summary Judgment;

The Court having considered the submissions of the parties, and for the reasons set forth in the Opinion filed concurrently with this Order;

**IT IS** on this 27th day of November, 2001, hereby **ORDERED** that Defendants' Motion for Summary Judgment is **GRANTED** as to Count One of Plaintiff's Complaint and it is hereby **DISMISSED**; and

**IT IS FURTHER ORDERED** that the Court will retain supplemental jurisdiction over Count Two of Plaintiff's Complaint pursuant to 28 U.S.C. § 1367; and

**IT IS FURTHER ORDERED** that a hearing on Defendants' Motion to dismiss Plaintiff's CEPA claim is scheduled for oral argument before the Court on December 3, 2001, at 9:30am in Courtroom 4D, Mitchell H. Cohen United States Courthouse, 4th and Cooper Streets, Camden, New Jersey; and

**IT IS FURTHER ORDERED** that the trial date scheduled for December 3, 2001 will be continued to a date to be determined by the Court, pending the outcome of the Court's determination of remaining Count 2 of the Complaint.

No Costs.