Wayne BRADSHAW, et al., Plaintiffs,

v.

TOWNSHIP OF MIDDLETOWN, et al., Defendants.

Civil Action No. 02–5225 (MLC).

United States District Court, D. New Jersey.

Dec. 4, 2003.

Nancy S. Martin, Law Offices of Linda B. Kenney, Red Bank, N.J., for Plaintiffs.

Bernard M. Riley, Dowd & Reilly, Red Bank, NJ, for Defendants Township of Middletown, Township of Middletown Police Department, Robert Czech, John Pollinger and Joseph Braun.

Charles J. Uliano, Chamlin, Rosen, Uliano & Witherington, West Long Branch, NJ, for Defendant Robert Morrell.

## MEMORANDUM OPINION

COOPER, District Judge.

This matter comes before the Court on defendants' separate motions pursuant to Federal Rule of Civil Procedure ("Rule") 12(b)(6) to dismiss plaintiffs' First Amended Complaint ("Amended Complaint").

Plaintiffs Wayne Bradshaw ("Bradshaw"), Steven Dollinger ("Dollinger"), Michael Rubino ("Rubino"), Gerald Weimer ("Weimer"), Christine Weimer and Nina Rubino filed the Amended Complaint asserting various causes of action against the defendants. Defendants Township of Middletown ("Township"), Township of Middletown Police Department ("Police Department"), Robert Czech ("Czech"), John Pollinger ("Pollinger") and Joseph Braun ("Braun") now move to dismiss the Amended Complaint insofar as it asserts claims against them. Defendant Robert Morrell ("Morrell") now separately moves to dismiss the Amended Complaint insofar as it asserts claims against him. The motion of defendants Township, Police Department, Czech, Pollinger and Braun will be granted in part and denied in part. The motion of defendant Morrell will be granted.

## BACKGROUND

### I. Procedural History

Plaintiffs filed a complaint on October 29, 2002. (Docket entry no. 1.) This gargantuan submission contains a 46-page "COMPLAINT & JURY DEMAND" followed by 52 exhibits that are appended without certification. All told, the complaint is two inches thick. The Court *sua sponte* ordered plaintiffs to file an amended complaint in compliance with local rules. (11–8–02 Order.) Plaintiffs then filed the Amended Complaint on December 2, 2002. (Docket entry no. 4.)

Rule 8(a) requires plaintiffs to submit to the Court "a short and plain statement of the claim showing that the pleader is entitled to relief, and . . . a demand for judgment for the relief the pleader seeks." Fed.R.Civ.P. 8(a). While the Amended Complaint is but a pale shadow of the original voluminous pleading, plaintiffs still took no chances. Thus, they submitted a 41-page Amended Complaint describing in intricate detail their various claims. The "Facts" section of the Amended Complaint is itself 30 pages long, and sets out a confusing, nonchronological litany of seemingly-unconnected events reminiscent of a James Joyce novel. The effect of this presentation would be soporific but for the Court's puzzlement at how these factual allegations somehow legally relate to one another.

Section V of the Amended Complaint, however, is another matter altogether. Entitled "Causes of Action," this section conclusorily demands judgment against defendants on six Counts. Little if any reference is made to the preceding 30 pages of factual allegations, which the Court can only assume form the basis for the causes of action asserted. The unfortunate combination of detailed factual allegations and conclusory demands for judgment leaves the Court unable to determine which factual allegations pertain to which plaintiffs' causes of action against which defendants. The effect on defendants, whom the Rules call upon to respond to such an Amended Complaint, must be equally bewildering: They know they are being sued, yet cannot tell from the pleadings for what offenses, exactly, they are being haled into court.

Defendants separately moved to dismiss the Amended Complaint on September 5 and September 12, 2003. (Docket entry nos. 12 & 13.) Apparently emboldened by plaintiffs' overlong Amended Complaint, defendants Township, Police Department, Czech, Pollinger and Braun accompanied their motion with a 55-page supporting brief, in violation of local rules. *See* L.Civ.R. 7.2(b) ("Any brief . . . shall not exceed 40 ordinary typed or printed pages."). They also submitted an 11-page document entitled "Statement of Material Facts as to Which There Exists No Genuine Dispute," which is inappropriate on a motion to dismiss, where the Court must accept as true all facts alleged in the

Amended Complaint. Plaintiffs opposed the separate motions to dismiss, and also violated Local Rule 7.2 with their 42–page brief.

The Court held oral argument on the separate motions in October 2003. Unlike the typical oral argument, this proceeding was less an adversarial contest of legal argument than a cooperative effort in which the parties and the Court attempted to determine what, exactly, the Amended Complaint alleged. Ultimately, this endeavor proved too much for those present, and the Court ordered further briefing. Specifically, plaintiffs were ordered to submit a chart reconstituting the Amended Complaint into a fashion the Court and defendants could understand. The Court ordered plaintiffs to explain which factual allegations pertained to (1) which plaintiffs; (2) which defendants; and (3) which causes of action. Plaintiffs provided this Rosetta Stone to enable the Court to decipher the Amended Complaint by letter of October 28, 2003 ("Plaintiffs' Letter").[1]

The end result of this tangled procedural history is as follows. The Amended Complaint asserts six causes of action against defendants. Count 1 of the Amended Complaint alleges that all defendants violated 42 U.S.C. § 1983 by unlawfully retaliating against plaintiffs Bradshaw, Dollinger, Rubino and Weimer for engaging in constitutionally protected speech. Count 2 of the Amended Complaint alleges that all defendants violated § 1983 by unlawfully retaliating against plaintiffs Bradshaw, Dollinger, Rubino and Weimer for engaging in constitutionally protected union activities. Count 3 of the Amended Complaint alleges that all defen-

dants violated § 1983 by unlawfully retaliating against plaintiffs Bradshaw, Dollinger, Rubino and Weimer for engaging in constitutionally protected petitioning for redress. Count 4 of the Amended Complaint alternatively alleges that the Township violated § 1983 by failing to train its officials, thus making the Township responsible for the constitutional violations alleged in Counts 1–3. Count 5, which alleged "Constitutional Tort," has been voluntarily withdrawn by plaintiffs. (10–28–03 Pl. Letter at 1.) Count 6, which alleged "New Jersey Constitutional Tort," has also been voluntarily withdrawn by plaintiffs. (*Id.*) As Count 6 was the only Count alleging a cause of action for plaintiffs Christine Weimer and Nina Rubino (the spouses of plaintiffs Gerald Weimer and Michael Rubino, respectively), the Amended Complaint will be dismissed insofar as it alleges causes of action on their behalf.

## II. *Factual History*

On a motion to dismiss we must accept as true all of plaintiffs' factual allegations. Because of the bizarre nature of this case, and the confusing pleading and briefing history, we will first describe the event that apparently precipitated this action, and then proceed to detail each individual plaintiff's allegations.

### a. *The Manure Incident*

The remaining plaintiffs are all police officers in the Township. Bradshaw, Dollinger and Weimer are all officers, and Rubino is a Lieutenant. (Am. Compl. at ¶¶ 3–6.) Defendant Morrell is also a Lieutenant in the Police Department. (*Id.* at ¶ 14.) The Amended Complaint alleges

---

1. While Plaintiffs' Letter has proved helpful in comprehending the Amended Complaint, the Court is dismayed to note that it mischaracterizes certain parts of the Amended Complaint. In many instances, Plaintiffs' Letter claims the Amended Complaint makes allegations that are in fact nowhere in the document. Plaintiffs' Letter also interprets certain allegations in the Amended Complaint to mean far more than any reasonable reading would support.

that all four plaintiffs were sent identical packages by Morrell in April 2002. (*Id.* at ¶ 37.) Each package allegedly contained "a huge pile of horse manure," and a threatening letter from Morrell. (*Id.* at ¶¶ 33, 37.) Plaintiffs do not allege that Morrell sent these packages as part of his job as a police officer.

Plaintiffs allege they were extremely disturbed by these packages and the accompanying letters because they believed Morrell to be emotionally and mentally unstable, and they knew he had access to many weapons. (*Id.* at ¶¶ 58–59.) They were further anxious because they allege that in early 2002, police officers in two neighboring towns had gone on "shooting sprees." (*Id.* at ¶ 31.)

Plaintiffs spent the next few months endeavoring to convince the Township and the Police Department to take action against Morrell on their behalf. They entreated defendant Pollinger, the Chief of Police, to conduct an Internal Affairs investigation. (*Id.* at ¶ 51.) The union to which Bradshaw, Dollinger and Weimer belong, the Patrolmen's Benevolent Association ("PBA"), sent letters to the Township asking that immediate action be taken. (*Id.* at ¶ 53.) Plaintiffs consistently requested that they be updated on the status of the investigation of the manure incident. (*Id.* at ¶¶ 63, 80, 82, 88.)

Plaintiffs allege that instead of responding to their pleas, defendants began a pattern of retaliation against them. Plaintiffs also assert that the Township's "failure to take immediate action demonstrates that the Township is permitting or otherwise sanctioning or condoning, if not, aiding and abetting: all of the actions of Lt. Morrell." (*Id.* at ¶ 87.)

This was the saga of the manure, which forms part (but by no means all) of the background for plaintiffs' myriad claims. The specific bases for plaintiffs' causes of action, as explained to the Court by Plaintiffs' Letter, are set out below.

### b. *Bradshaw*

Bradshaw first alleges an instance of protected conduct that occurred prior to the manure incident and for which he suffered retaliation. Plaintiffs allege there was a dispute in the Police Department as to whether officers should be sent to New York City to help in the days following the September 11, 2001 terrorist attacks. (*Id.* at ¶ 96(B)(1)-(23).) Pollinger did not think Middletown police officers were needed in New York after September 11 itself. (*Id.* at ¶ 96(B)(5).) The plaintiffs all believed help was needed on September 12 and 13. (*Id.* at ¶ 96(B)(13).) Bradshaw alleges he spoke out on television and in newspapers regarding the events of September 11. (*Id.* at ¶ 96(B)(24).) He alleges that Pollinger retaliated against him for this speech by commenting in a different newspaper article "that comments made by . . . Bradshaw . . . were a lie and that Bradshaw knew it was a lie." (*Id.* at ¶ 96(D)(5).)

Bradshaw also alleges he engaged in the following protected conduct in connection with the manure incident. First, he alleges he wrote to Pollinger to complain about an offensive cartoon relating to the manure incident, which had been posted in the police locker room. (*Id.* at ¶¶ 60–61.) Second, he alleges that letters were sent to the Township and Prosecutor's Office on his behalf regarding Morrell's behavior. (*Id.* at ¶¶ 53–54.) Third, he alleges he expressed concern that Morrell was still in charge of the SWAT Team following the manure incident.[2] (*Id.* at ¶ 70.) Fourth, he alleges he wrote Pollinger a letter de-

---

**2.** The Amended Complaint does not actually make this particular allegation in the manner asserted by Plaintiffs' Letter. The letter

tailing various violations of rules and regulations committed by Morrell. (*Id.* at ¶ 74.) Fifth, Bradshaw alleges he informed the Township that it should investigate the disclosure of a confidential portion of his own personnel report to the press. (*Id.* at ¶ 80.) Sixth, he alleges he wrote a memo to Pollinger asking that Rubino and Dollinger be transferred to another assignment so they would not come into contact with Morrell. (*Id.* at ¶ 96(D)(22).) Seventh, Bradshaw alleges he requested that an Internal Affairs investigation be conducted into Morrell's behavior. (*Id.* at ¶ 51.)[3]

Bradshaw alleges he was retaliated against for his protected conduct in a variety of ways. First, he alleges he was not informed that Morrell was in fact not removed from the head of the SWAT team. (*Id.* at ¶¶ 66–70.) Second, he alleges that Pollinger wrote a memo "intimating that Detective Bradshaw may be subject to disciplinary action." (*Id.* at ¶ 63.) Third, even though a "No Contact" order was put into effect as between Morrell and the plaintiffs, Bradshaw alleges the Township took no action to enforce it. (*Id.* at ¶¶ 75–76.) Fourth, Bradshaw alleges Pollinger accused him of attempting to taint the

claims this allegation appears in Paragraphs 66 and 67 of the Amended Complaint. (10–28–03 Pl. Letter, Bradshaw Ex., at 2.) The letter further claims that not only Bradshaw, but *all* of the plaintiffs "expressed their concern" about Morrell's position with the SWAT Team. (*Id.* at Dollinger Ex., at 3; *id.* at Rubino Ex., at 3; *id.* at Weimer Ex., at 3.) However, Paragraphs 66 and 67 actually state:

> 66%. y(3)27 [O]n or about April 29, 2002, Det. Bradshaw was informed by Deputy Chief Oches that Morrell had been relieved temporarily as the Department's SWAT Team Commander.
>
> 67. On or about May 17, 2002, Deputy Chief Oches once again reiterated to each of the Plaintiffs that Lt. Morrell had been removed from the SWAT Team. Contrary to Deputy Chief Oches' statement, on the same date, Lt. Morrell issued a memo addressed to the SWAT Team Members regarding a Meeting scheduled for June 12, 2002.

(Am. Compl. at ¶¶ 66–67.) These Paragraphs do not allege any conduct by any of the plaintiffs; all that is alleged is that they were spoken to by Oches. However, Paragraph 70 of the Amended Complaint does state that Bradshaw "wrote to Deputy Chief Oches notifying him that it appeared that Lt. Morrell was still acting as a leader of the SWAT Team." (*Id.* at ¶ 70.) Thus, the Amended Complaint does allege Bradshaw spoke to someone about Morrell's role with the SWAT Team. However, this Paragraph makes no mention of the other three officer plaintiffs. Plaintiffs' Letter's baseless claim that the Amended Complaint alleges that Dollinger, Rubino and Weimer all "expressed concern" about Morrell's position on the SWAT Team is an example of the inappropriate behavior discussed in n. 1, *supra.*

3. The Amended Complaint alleges that the other plaintiffs engaged in some of the same conduct as Bradshaw with regard to the manure incident. Specifically, it alleges that the letters sent on behalf of Bradshaw to the Township and Prosecutor's Office were also sent on behalf of Dollinger, Rubino and Weimer. (Am. Compl. at ¶¶ 53–54.) It also alleges that Dollinger, Rubino and Weimer all requested an Internal Affairs investigation. (*Id.* at ¶ 51.) Because we hold, *infra*, that all of the officers' conduct with regard to the manure incident (save one exception) is not protected by the First Amendment, we analyze these two common instances of speech only in reference to Bradshaw. However, our discussion applies equally to all plaintiffs alleging they engaged in the same conduct alleged by Bradshaw.

Plaintiffs' Letter also claims that Bradshaw's letters to Pollinger concerning the cartoon and Morrell's rule violations, respectively, were "on behalf of" the other plaintiffs as well as himself. (10–28–03 Pl. Letter, Dollinger Ex., at 3–4; *id.* at Rubino Ex., at 3; *id.* at Weimer Ex., at 3.) The Amended Complaint, however, does not allege Bradshaw made these communications on behalf of anyone but Bradshaw. (Am. Compl. at ¶¶ 61, 74.) As in n. 2 *supra*, plaintiffs here duplicitously attempt to use Plaintiffs' Letter to reamend the Amended Complaint without leave from the Court.

Internal Affairs investigation into Morrell's conduct. (*Id.* at ¶ 64.) Fifth, he alleges someone unlawfully disclosed a portion of his personnel file to the press. (*Id.* at ¶¶ 80–81.) Sixth, Bradshaw alleges he was ordered "to avoid direct contact" with Morrell, while Morrell was only ordered "to attempt to avoid contact" with Bradshaw, "thus, appearing that [Bradshaw was] being held to a higher standard." (*Id.* at ¶ 89.) Seventh, Bradshaw alleges that on July 9, 2002, he was reprimanded for "conduct unbecoming a police officer." (*Id.* at ¶ 96(D)(6).) Eighth, he alleges that "a short time after the actions in sending the packages," Morrell was "transferred to supervise a patrol squad." (*Id.* at ¶ 92.) This change allegedly placed Morrell in much greater contact with Bradshaw. (*Id.*)

Bradshaw lastly alleges that on September 5, 2002 he engaged in protected conduct when he informed Pollinger that he and the other three officer plaintiffs planned on bringing this action. (*Id.* at

¶ 96(D)(27).) Bradshaw alleges that Pollinger retaliated against him for bringing the lawsuit by transferring him "out of the Detective's Bureau in one week." (*Id.* at ¶ 96(D)(29).) [4]

### c. Dollinger

Dollinger alleges three types of protected behavior in which he engaged before the manure incident, and for which he received retaliation. First, he alleges that in January 1999, in his capacity as a member of the Board of Trustees of the PBA, he "took a stand" and spoke out about Pollinger's scheme to change the uniforms of the Police Department and force the officers to pay half of the cost.[5] (*Id.* at ¶ 96(A)(1)-(2).) Second, he alleges he was a plaintiff in a lawsuit filed against the Police Department in 2000.[6] (*Id.* at ¶ 96(A)(6)-(8).) Third, he alleges that at an unspecified time he filed a grievance contesting a letter of reprimand issued to him. (*Id.* at ¶ 96(A)(17)-(18).)

4. Plaintiffs' Letter also identifies four other instances of Bradshaw's protected conduct alleged by the Amended Complaint. (10–28–03 Pl. Letter, Bradshaw Ex., at 1–3.) We hold that these allegations either fail to allege anything resembling protected conduct, or are not actually alleged by the Amended Complaint. The Amended Complaint does not allege that Bradshaw "openly opposed" Pollinger's uniform change proposal. *See* n. 5 *infra*. Nor does it allege that "Bradshaw instituted a lawsuit alleging violations of the Fair Labor Standards Act." *See* n. 6 *infra*. An allegation that Bradshaw received Morrell's package, and that the Township knew about it, does not allege conduct protected by the Constitution. (Am. Compl. at ¶¶ 37, 47.) Nor does the allegation that Bradshaw received a threatening note on the windshield of his car identify protected conduct. (*Id.* at ¶ 83.)

5. Plaintiffs' Letter also claims the Amended Complaint alleges that Bradshaw and Weimer "openly opposed" Pollinger's proposal. (10–28–03 Pl. Letter, Bradshaw Ex., at 1; *id.* at Weimer Ex., at 1.) The relevant part of the

Amended Complaint, however, states "[Pollinger's proposal] was in violation of the P.B.A. contract and Dollinger took a stand against this action along with other officers." (Am. Compl. at ¶ 96(A)(2).) The words "other officers" could apply to any member of the PBA. This allegation is too vague to support the specific claim Plaintiffs' Letter makes. Once again, plaintiffs have overstepped the Court's instructions and attempted to reamend the Amended Complaint.

6. Plaintiffs' Letter also claims the Amended Complaint alleges that Bradshaw and Weimer were involved in this lawsuit. (10–28–03 Pl. Letter, Bradshaw Ex., at 1; *id.* at Weimer Ex., at 1.) Again, however, the Amended Complaint does not support this contention. The relevant paragraphs state that the PBA filed the lawsuit in question, and that Dollinger was a plaintiff in it. (Am. Compl. at ¶ 96(D)(6)-(8).) There is no mention of either Bradshaw or Weimer, or any person other than Dollinger. Once again, plaintiffs have overstepped the Court's instructions and attempted to reamend the Amended Complaint.

Dollinger alleges he was retaliated against in a number of ways for his protected conduct. First, he alleges Pollinger "put a stop to the development of the canine program, which Dollinger had initiated." (*Id.* at ¶ 96(A)(3).) Second, he alleges Pollinger "ripped up a letter of recommendation he had written" for Dollinger. (*Id.* at ¶ 96(A)(4).) Third, he alleges Pollinger "sent a memo to Dollinger banning him from having any contact with his [police] dog while on duty." (*Id.* at ¶ 96(A)(10).) Fourth, he alleges he was improperly reprimanded for submitting a request for "comp time." (*Id.* at ¶ 96(A)(17).) Fifth, he alleges that "[w]ithin weeks of" his grievance, he was placed on rotating shifts, including a midnight shift. (*Id.* at ¶ 96(A)(18)-(19).) Sixth, he alleges that defendant Braun, a Deputy Chief of Police, "began kicking back reports and other correspondence drafted by Dollinger for minor spelling errors and other trivial mistakes." (*Id.* at ¶ 96(A)(20).) Seventh, he alleges Pollinger and Braun refused to allow him to serve on a special commission of the PBA for which he had been selected. (*Id.* at ¶ 96(A)(22)-(23).) Eighth, Dollinger alleges Braun refused to allow him to investigate a robbery. (*Id.* at ¶ 96(A)(24)-(25).) Ninth, he alleges Pollinger intimated that he might not promote Dollinger to Sergeant, even though Dollinger had been "listed as second on the Sergeant's test." (*Id.* at ¶ 96(A)(13)-(14).)

The Amended Complaint does not allege that Dollinger personally engaged in any protected conduct with regard to the manure incident. The Amended Complaint does allege that Pollinger learned that all of the plaintiffs intended to file a lawsuit on September 5, 2002. However, the Amended Complaint does not allege that Dollinger was retaliated against after this incident (though Plaintiffs' Letter does strangely suggest that Morrell's July 15, 2002 transfer to the patrol squad was retaliation for this event occurring two months later). (10–28–03 Pl. Letter, Dollinger Ex., at 4.) [7]

### d. *Rubino*

Rubino alleges one instance occurring before the manure incident in which he engaged in protected conduct and subsequently suffered retaliation. Rubino alleges that on September 13, 2001, he told Pollinger that he thought Township police officers should be sent to Manhattan to help in the aftermath of the September 11 terrorist attacks. This conversation allegedly took place in Pollinger's office, and grew heated as the two men disagreed over whether officers should be sent, or even be allowed to voluntarily go to help if they so desired. (Am. Compl. at ¶ 96(B)(9)-(22).)

Rubino alleges he was retaliated against for this protected speech in a number of ways. First, he alleges he was "relieved of his command and transferred to the Patrol

---

**7.** Plaintiffs' Letter also identifies seven other instances of Dollinger's protected conduct alleged by the Amended Complaint. (10–28–03 Pl. Letter, Dollinger Ex., at 1–4.) We hold that these allegations either fail to allege anything resembling protected conduct, or are not actually alleged by the Amended Complaint. The Amended Complaint does not allege that Bradshaw's memorandum to Pollinger asking that Dollinger and Rubino be transferred was written on Dollinger's behalf. The allegation that Dollinger went to New

York City to assist in the aftermath of September 11 does not state an allegation of protected conduct. (Am. Compl. at ¶ 96(B)(13).) Nor does an allegation that Dollinger received Morrell's package, and that the Township knew about it, allege conduct protected by the Constitution. (*Id.* at ¶¶ 37, 47.) Plaintiffs' Letter's claims that Dollinger engaged in other protected conduct in connection with the manure incident are discussed in nn. 2 and 3, *supra.*

Division as a shift commander" on September 28, 2001. (*Id.* at ¶ 96(D)(2).) Rubino alleges he was told he was transferred "because [he] 'did not comply with the directives of a superior.'" (*Id.* at ¶ 96(D)(4).) Second, Rubino alleges that defendant Czech, the Township Administrator, "malign[ed] Rubino with his comments" to a newspaper about the transfer. (*Id.* at ¶ 96(D)(14).) Third, Rubino alleges that in January 2002 he was retaliated against "when nearly eight hundred dollars was taken out of his pay without any notice or hearing because a computer that had been ordered was missing." (*Id.* at ¶ 96(D)(8).) He alleges he was also charged with neglect of duty because of this incident. (*Id.* at ¶ 96(D)(9).) Fourth, he alleges that Pollinger gave him a negative evaluation in retaliation for his speaking out. (*Id.* at ¶ 96(D)(30)-(32).) Fifth, he alleges his requests to attend training courses and the Narcotics Officers Convention in 2002 were denied. (*Id.* at ¶ 96(D)(10)-(11).) Sixth, he alleges "his dues for National Narcotics Association were not paid wherein they had been paid by the Department for nearly fifteen years." (*Id.* at ¶ 96(D)(12).) [8]

The Amended Complaint does not allege that Rubino personally engaged in any protected conduct with regard to the manure incident. While the Amended Complaint does allege that Pollinger learned that all of the plaintiffs intended to file a lawsuit on September 5, 2002, there is no allegation that Rubino was retaliated against as a result.[9]

### e. *Weimer*

Weimer alleges one instance of protected conduct arising out of the manure incident. He alleges that in May 2002 he "documented and reported [a] strange and disturbing incident" in which Morrell followed him around in a maroon Dodge pickup truck for no apparent reason. (*Id.* at ¶¶ 71–72.) Weimer allegedly made this report to Detective Lieutenant Michael Cerame ("Cerame"). (*Id.* at ¶ 72.) Weimer alleges that he was retaliated against for this conduct because "[t]he Township has done nothing to investigate or otherwise address this disturbing event by Lt. Morrell." (*Id.* at ¶ 73.) [10]

---

8. Plaintiffs' Letter also claims the Amended Complaint alleges that the last three acts alleged were in retaliation for a grievance filed by Rubino in connection with the neglect of duty charge. (10–28–03 Pl. Letter, Rubino Ex., at 2.) We hold that Plaintiffs' Letter once again mischaracterizes the Amended Complaint. While the pleading does make a vague allusion to a grievance, there is no allegation that the acts enumerated above were taken in retaliation for that grievance. (*See* Am. Compl. at ¶ 96(D)(8)-(12).)

9. Plaintiffs' Letter also identifies five other instances of Rubino's protected conduct alleged by the Amended Complaint. (10–28–03 Pl. Letter, Rubino Ex., at 1–4.) We hold that these allegations either fail to allege anything resembling protected conduct, or are not actually alleged by the Amended Complaint. The allegation that Rubino received Morrell's package, and that the Township knew about it, does not allege conduct protected by the Constitution. (*Id.* at ¶¶ 37, 47.) Plaintiffs' Letter's claims that Rubino engaged in other

protected conduct in connection with the manure incident are discussed in nn. 2 and 3, *supra.*

10. Plaintiffs' Letter also identifies eight other instances of Weimer's protected conduct alleged by the Amended Complaint. (10–28–03 Pl. Letter, Weimer Ex., at 1–4.) We hold that these allegations either fail to allege anything resembling protected conduct, or are not actually alleged by the Amended Complaint. The Amended Complaint does not allege that Weimer "openly opposed" Pollinger's uniform change proposal. *See* n. 5 *supra.* Nor does it allege that Weimer had anything to do with the 2000 lawsuit in which Dollinger was a plaintiff. *See* n. 6 *supra.* The allegation that Weimer went to New York City to assist in the aftermath of September 11 does not state an allegation of protected conduct. (Am. Compl. at ¶ 96(B)(13).) Nor does an allegation that Weimer received Morrell's package, and that the Township knew about it, allege conduct protected by the Constitu-

## DISCUSSION

A complaint may be dismissed pursuant to Rule 12(b)(6) for "failure to state a claim upon which relief can be granted." Fed. R.Civ.P. 12(b)(6). On a motion to dismiss we must accept as true all of the factual allegations in the complaint, and must draw all reasonable inferences in favor of the plaintiffs. *Doe v. Delie*, 257 F.3d 309, 313 (3d Cir.2001). "Dismissal of claims [on a motion to dismiss] is appropriate only if it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim upon which relief may be granted." *Jakomas v. McFalls*, 229 F.Supp.2d 412, 419 (W.D.Pa.2002).

Plaintiffs allege causes of action under § 1983. It states:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proper proceeding for redress.

42 U.S.C. § 1983. "By its own terms, the statute does not create substantive rights. Instead, it only provides remedies for deprivations of rights established elsewhere in the Constitution or federal laws." *Brown v. Pa. Dep't of Health Emergency Med. Servs. Training Inst.*, 318 F.3d 473, 477 (3d Cir.2003). Thus, to state a claim upon which relief can be granted plaintiffs must allege that defendants, "act[ing] under color of state law," deprived them of rights guaranteed by the Constitution or federal law. *Dennison v. Pa. Dep't of Corr.*, 268 F.Supp.2d 387, 396 (M.D.Pa. 2003).

The remaining plaintiffs allege four such claims against the six defendants. Before we discuss each cause of action, however, we first address the issue of defendant Morrell's liability.

## I. Claims Against Defendant Morrell

The Amended Complaint does not allege that Morrell retaliated against any of the plaintiffs for any exercise of protected conduct. Certainly, there are ample allegations of misfeasance by Morrell that may state a claim for state law tort. However, plaintiffs are suing under § 1983, and therefore must allege that, under color of law, Morrell violated their constitutional or federal statutory rights. Because the Amended Complaint does not allege that Morrell violated plaintiffs' rights under color of law, it will be dismissed insofar as it asserts causes of action against him. With four plaintiffs (Bradshaw, Dollinger, Rubino and Weimer), five defendants (Township, Police Department, Czech, Pollinger and Braun), and four causes of action remaining, we turn to whether plaintiffs have alleged claims against them upon which relief may be granted.

## II. Claims Against Defendants Czech, Pollinger and Braun

Plaintiffs allege that the individual defendants Czech, Pollinger and Braun unlawfully retaliated against them for engaging in conduct protected by the First Amendment. A cause of action for retaliation for protected conduct under § 1983 is stated upon allegations that (1) the plaintiffs engaged in protected conduct; (2) the plaintiffs were retaliated against; and (3) the protected conduct was a substantial or motivating factor in the retaliation. *See Baldassare v. New Jersey*, 250 F.3d 188, 194–95 (2001); *Harley v. City of Philadel-*

tion. (*Id.* at ¶¶ 37, 47.) Plaintiffs' Letter's claims that Weimer engaged in other protect-

ed conduct following the manure incident are discussed in nn. 2 and 3, *supra*.

*phia,* No. 01–6143, 2003 WL 22597606, at *3 (E.D.Pa. Nov. 4, 2003); *Jakomas,* 229 F.Supp.2d at 420. There is no dispute that the Amended Complaint adequately alleges the third element of this cause of action, that the protected conduct was a substantial or motivating factor in the adverse action. Thus, the only issues are whether plaintiffs have properly alleged that (1) they engaged in protected conduct, and (2) they suffered retaliation at the hands of defendants as a result.

■■■ Plaintiffs allege three types of protected conduct, which we discuss *infra.* Plaintiffs also allege multiple instances of retaliation. The First Amendment's protections against retaliation are broad: it insulates public employees not just from retaliatory discharge or demotion, but also "from even an act of retaliation as trivial as failing to hold a birthday party for a public employee when intended to punish her for exercising her [First Amendment] rights." *Rutan v. Republican Party of Ill.,* 497 U.S. 62, 75 n. 8, 110 S.Ct. 2729, 111 L.Ed.2d 52 (1990) (quotations omitted). "[A]n employment action is considered adverse, for the purposes of determining unlawful retaliation, if it is likely to chill 'a person of ordinary firmness' in the exercise of their First Amendment rights." *Marrero v. Camden County Bd. of Soc. Servs.,* 164 F.Supp.2d 455, 467 (D.N.J. 2001) (quoting *Suppan v. Dadonna,* 203 F.3d 228, 235 (3d Cir.2000)). *See also Kadetsky v. Egg Harbor Township Bd. of Educ.,* 82 F.Supp.2d 327, 337 (D.N.J.2000).

### a. *Count 1: Retaliation for Exercising the Right to Speak*

■■■ Plaintiffs first allege that they were retaliated against for exercising the right to speak on matters of public concern. "A public employee has a constitutional right to speak on matters of public concern without fear of retaliation." *Baldassare,* 250 F.3d at 194. However,

[w]hile public employees do not give up all the First Amendment rights they would otherwise enjoy as citizens to comment on matters of public interest, the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general. *Swartzwelder v. McNeilly,* 297 F.3d 228, 235 (3d Cir.2002) (quotations and citations omitted). To accommodate the conflicting interests of the speaker and the government, we conduct a two-part inquiry to determine whether a public employee's speech is protected by the First Amendment from government restriction. "First, the employee's conduct must address a 'matter of public concern'. . . . Second, the value of that expression must outweigh 'the government's interest in the effective and efficient fulfillment of its responsibilities to the public.'" *Azzaro v. County of Allegheny,* 110 F.3d 968, 976 (3d Cir.1997) (en banc) (quoting *Connick v. Myers,* 461 U.S. 138, 147–48, 150, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983)). This inquiry is a question of law. *Walker v. City of Camden,* 57 Fed.Appx. 943, 945, 2003 WL 202505 (3d Cir.2003).

■■■ The first question is "whether the employee's speech can be fairly considered as relating to any matter of political, social, or other concern to the community." *Swartzwelder,* 297 F.3d at 235 (quotations omitted). "[S]peech related to broad social or policy issues is of public concern." *Sanguigni v. P'burgh Bd. of Pub. Educ.,* 968 F.2d 393, 397 (3d Cir.1992). However, speech pertaining to private grievances not of interest to the public at large is not speech on a matter of public concern. *Swineford v. Snyder County Pa.,* 15 F.3d 1258, 1271 (3d Cir.1994). *See also Cooper v. Cape May County Bd. of Soc. Servs.,* 175 F.Supp.2d 732, 743–44 (D.N.J.2001)

(public employee's speech on superior's behavior not of public concern because "the general public does not share [plaintiff's] concern with" his superior's actions toward him); *Kadetsky v. Egg Harbor Township Bd. of Educ.*, 164 F.Supp.2d 425, 435 (D.N.J.2001) (teacher's speech on school policies not of public concern because teacher "was motivated at all times by concern for his personal employment").

■ The Court "focus[es] on the content, form, and context of the activity in question" when conducting the public concern analysis. *Baldassare*, 250 F.3d at 195. All three elements must be considered. That the content of the speech is of public concern does not end the inquiry. *See Nichol v. ARIN Intermediate Unit 28*, 268 F.Supp.2d 536, 557–60 (W.D.Pa.2003). Similarly, the motive with which the public employee speaks, "while often a relevant part of the context of the speech, is not dispositive in determining whether a particular statement relates to a matter of public concern." *Azzaro*, 110 F.3d at 978. And speech may be uttered in private form and yet still enjoy First Amendment protection. *Id.* at 977 (observing that "the community's interest in the free exchange of information and ideas relating to matters of public concern is not limited to public declarations").

The second step of the analysis, taken only if the speech is of public concern, "weigh[s] the public employee's interest in speaking about a matter of public concern and the value to the community of her being free to speak on such matters" against "the government's interest as an employer in promoting the efficiency of the services it performs through its employees." *Id.* at 980. Only if the speech's value "is outweighed by the government's interest in effective and efficient provision of services, will we hold that the speech is unprotected." *Id.* "[T]he manner, time, place, and entire context of the expression

are relevant" in this inquiry as well. *Swartzwelder*, 297 F.3d at 235. The pertinent considerations include

> whether the statement impairs discipline by superiors or harmony among coworkers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise.

*Rankin v. McPherson*, 483 U.S. 378, 388, 107 S.Ct. 2891, 97 L.Ed.2d 315 (1987).

■ A police department, as a law enforcement agency, has "wide latitude to regulate an employee's speech when that speech impacts on areas such as discipline, morale, harmony, uniformity, and trust in the ranks." *Ober v. Evanko*, 80 Fed.Appx. 196, 200, 2003 WL 22596339, at *4 (3d Cir.2003). In *Ober*, the Third Circuit held that although the police officer plaintiff's speech was of public concern, he failed to show that "his interests in communicating . . . outweigh[ed] the State's interest in maintaining order, trust, discipline, and efficient communication [in the police department]. Therefore, [the plaintiff] did not engage in protected speech." *Id.* 80 Fed.Appx. 196, 200, 2003 WL 22596339 at *5.

#### i. *Bradshaw*

Bradshaw alleges eight instances in which he spoke out on a matter of public concern, and was retaliated against. We first address the latter seven occasions, all of which arise out of the manure incident. These seven allegations, detailed *supra*, claim that communications were made to defendants by Bradshaw or on his behalf.

■ The content of Bradshaw's speech (with the exception of Bradshaw's request that the Township investigate the disappearance of a portion of his personnel

file [11]) relates to Morrell and the manure incident. Taking as true all of plaintiffs' allegations, this content, viewed alone, could arguably be considered a matter of public concern. Plaintiffs have alleged they were concerned that Morrell was unstable, and that his access to weapons made him a danger to them. The public may be interested to know of a police lieutenant who is on edge, and possibly prone to embarking on a shooting spree. Thus, the content of the speech weighs in Bradshaw's favor.

The context in which Bradshaw's speech took place, however, counsels against holding that his communications related to a matter of public concern. "[S]peech disclosing public officials' misfeasance is protected while speech intended to air personal grievances is not." *Swineford*, 15 F.3d at 1271. The allegations in the Amended Complaint detail a private feud between Morrell and plaintiffs. Morrell allegedly sent threatening letters and manure to each of the plaintiffs. They were all understandably upset by this behavior, and wanted to see Morrell punished and kept away from them. They allege they instituted an Internal Affairs investigation against him. They allege they sought to have him removed as the head of the SWAT Team. They allege they asked to be assigned to positions where they would not come into contact with him. They allege they persistently asked Pollinger and the Township to take action against Morrell, and sought to be continuously apprised of what was being done about him. They even allege they filed criminal charges against him. (Am. Compl. at ¶ 93.) The Amended Complaint alleges this feud was continued by Morrell as well. It is alleged that he has twice assaulted Weimer. (*Id.* at ¶ 77.) Plaintiffs also intimate that Morrell left a threatening note on Bradshaw's windshield.

Plaintiffs do not, however, allege they demanded Morrell be relieved of duty altogether. They do not allege they urged that he be taken off the streets for fear of the public's safety. Their alleged speech was at all times limited to their own, private concerns. In short, plaintiffs' speech is consistent with the overall theme of the Amended Complaint: they wished to see Morrell disciplined and kept away from them, not because they feared he posed a danger to the community as a whole, but because they disliked him and were concerned that he posed a threat to their own personal safety. Therefore, we hold that Bradshaw's speech (as well as the identical allegations of speech by the other plaintiffs, *see* n. 3, *supra*) took place in a context "entirely devoted to personal matters and had no relationship to the process of self-governance." *Szustowicz v. City of Philadelphia*, No. 02–2054, 2003 WL 1818175, at *5 (E.D.Pa. Mar. 26, 2003) (holding officer's complaints to supervisors alleging discrimination not of public concern because "her speech was [only] important to her and the employees about whom she was complaining").

The form in which Bradshaw's speech was delivered also weighs against holding it to be of public concern. He does not allege he spoke to the public at large about Morrell. Rather, his alleged comments were confined to his superior officers, and letters sent to the Township and Prosecutor's Office on his behalf. While speech does not have to be a public declaration to be of public concern, the limited way in which Bradshaw chose to make himself heard does weigh against him in the public concern balance.

11. This alleged speech is not on a matter of public concern. The content of it was purely private. No one but Bradshaw himself is interested in Bradshaw's personnel file.

Bradshaw's speech pertaining to Morrell, as well as that of the other plaintiffs, *see* n. 3 *supra*, thus fails the first step of the test laid out above. These communications do not "relat[e] to any matter of political, social, or other concern to the community" as a whole. *See Connick*, 461 U.S. at 146, 103 S.Ct. 1684. Nor do they touch on issues of self-government, corruption, fraud or illegality. *See Zugarek v. S. Tioga Sch. Dist.*, 214 F.Supp.2d 468, 474–75 (M.D.Pa.2002). Accordingly, we hold that Bradshaw and the other plaintiffs fail to state claims of retaliation for engaging in speech on a matter of public concern for their alleged speech with regard to Morrell and the manure incident.[12]

▇ Bradshaw's other alleged exercise of his free speech rights, however, is a different matter. The Amended Complaint appears to allege that Bradshaw spoke out on television and in newspapers regarding the Police Department's response to September 11. (*Compare* Am. Compl. at ¶ 96(B)(24) *and id.* at ¶ 96(D)(5).) We hold that, given its content, form, and context, this speech is on a matter of public concern. The events of September 11, 2001 are still of broad interest to the populace. Public comments from a police officer regarding how his department responded to the perceived need for assistance in Manhattan in the days immediately following the attacks qualifies as speech on a matter of public concern.

Our inquiry, however, does not end with public concern. We must also ask whether Bradshaw's interests in speaking outweighed the government's interests in promoting the efficiency of the public services

it provides. *Sanguigni*, 968 F.2d at 397. If the employee's speech undermines the government's ability to function properly, the First Amendment may not protect the speaking employee. *Jakomas*, 229 F.Supp.2d at 420. Concern for the government's interests is especially great in the context of law enforcement. *See Ober*, 80 Fed.Appx. at 200, 2003 WL 22596339, at *4.

We hold that the Amended Complaint's allegations regarding the circumstances surrounding Bradshaw's speech do not permit us to conduct this balancing at this time. Bradshaw alleges he spoke publicly about the September 11 crisis. The allegations concerning the exact content of his speech, however, are unclear: one paragraph of the Amended Complaint alleges Bradshaw voiced his concern for the safety of the officers working in Manhattan, while another appears to allege he expressed disagreement with how the Police Department responded to September 11. (Am. Compl. at ¶ 96(B)(24), (D)(5).) The Amended Complaint also does not allege when Bradshaw spoke in relation to the time of the September 11 crisis. Given these vagaries, we find that we are unable to state definitively that the government's interests in effective and efficient functioning outweighed Bradshaw's interests in speaking. *See Jakomas*, 229 F.Supp.2d at 421 (holding "that the factors we must balance ... are not sufficiently developed at this stage in the litigation" to resolve whether plaintiff's speech is protected by First Amendment). Accordingly, at least for now, we hold that Bradshaw's speech is protected by the First Amendment.

12. We further observe that it is likely that plaintiffs' speech would fail the second inquiry as well. The bulk of plaintiffs' speech relates to how the Police Department was conducting its inner workings and deploying its officers. Given the wide latitude afforded law enforcement agencies in responding to employee speech, it would be difficult for plaintiffs to show that their interests in speaking outweighed defendants' interests in effective and efficient fulfillment of their responsibilities to the community.

■ The second element that must be alleged is retaliation. Bradshaw alleges that Pollinger retaliated against him for this speech by calling him a liar in a different newspaper. Specifically, he alleges Pollinger said "that comments made by ... Bradshaw ... were a lie and that Bradshaw knew it was a lie." (Am. Compl. at ¶ 96(D)(5).) We hold that this allegation does not state a claim for retaliation. Conduct is retaliatory if it is "sufficient to deter a person of ordinary firmness from exercising his First Amendment rights." *Suppan*, 203 F.3d at 235. Here, Pollinger's allegedly retaliatory behavior was to go to a newspaper and publicly disagree with Bradshaw. A person of ordinary firmness would not be deterred from exercising his constitutional rights out of fear that someone might simply disagree with his version of the facts, however ungraciously. To paraphrase Judge Posner:

It would trivialize the First Amendment to hold that harassment for exercising the right of free speech was always actionable no matter how unlikely to deter a person of ordinary firmness from that exercise—that if [Pollinger] had frowned at [Bradshaw] for [exercising his rights] he would be liable for damages ... under section 1983.

*Bart v. Telford,* 677 F.2d 622, 625 (7th Cir.1982). Accordingly, we hold that Bradshaw has failed to state a claim for retaliation for engaging in the protected activity of free speech, and we will grant the part of the motion to dismiss the Amended Complaint insofar as it asserts such a claim against defendants.

### ii. *Dollinger*

■ Dollinger alleges he spoke out in January 1999 against Pollinger's proposal to change the Police Department's uniforms. This proposal allegedly would have cost all police officers money, because they were allegedly to be charged half of the cost of the uniform change. We must give plaintiffs the benefit of all reasonable inferences on a motion to dismiss. Where the facts as alleged by a plaintiff plainly demonstrate that the speech in question is not on a matter of public concern, we can hold that no claim of protected conduct is alleged. *See* § II(a)(i) *supra.* Here, however, the brief allegations concerning Dollinger's speech do not permit us to state definitively that his speech is not of public concern. *See Jakomas,* 229 F.Supp.2d at 421 (holding "that the factors we must balance ... are not sufficiently developed at this stage in the litigation" to resolve whether plaintiff's speech is protected by First Amendment). Therefore, at least for now, we hold that Dollinger's speech is on a matter of public concern.

We further hold that the government's interests in efficient functioning do not outweigh Dollinger's interests in speaking, or the public's interests in hearing what Dollinger allegedly had to say. Defendants do not argue that Dollinger's speech undermined the efficiency of the Police Department's operations. Thus, Dollinger has alleged the first element of retaliation for exercising his constitutional rights.

The next issue is whether Dollinger was retaliated against. He alleges nine instances of retaliation by Pollinger and Braun. These occasions, detailed *supra,* range from being ordered not to see his police dog to being refused permission to serve on a union commission for which he had been selected. All of these alleged retaliatory events related to Dollinger's employment conditions. Given the low threshold required for demonstrating retaliation, we hold that Dollinger may be able to show facts proving that these acts were likely to deter a person of ordinary firmness from exercising the rights guaranteed by the First Amendment.

We therefore hold that Dollinger has properly stated a cause of action of retalia-

tion for engaging in protected speech against Pollinger and Braun, and defendants' motions will be denied insofar as they seek dismissal of those claims. However, as none of Dollinger's allegations pertain to Czech, Dollinger fails to state a cause of action against him, and we will accordingly grant the motions to dismiss this claim as against Czech.

### iii. *Rubino*

 Rubino alleges that his conversation with Pollinger on September 13, 2001 is speech on a matter of public concern protected by the First Amendment. We hold that his speech is indeed on a matter of public concern. Like Bradshaw, Rubino alleges he was concerned with the Police Department's reaction to the post-terrorist attack situation in Manhattan, and he therefore entreated Pollinger to send officers to help, or at least to allow those who were interested to go lend assistance. For the same reasons we found Bradshaw's speech to be on a matter of public concern, we hold that Rubino's speech satisfies the first step of our inquiry.[13]

The second prong in the public employee speech inquiry, however, weighs against Rubino. The facts alleged in the Amended Complaint, which we must take as true, demonstrate that Rubino's alleged argument jeopardized the functioning of the Police Department. Two days after the September 11 attacks, with the nation still anticipating further acts of terrorism, Rubino allegedly told Pollinger that officers should be sent to New York to help out at the site of the attack. (Am. Compl. at ¶ 96(B)(9).) Pollinger allegedly responded that "no Middletown officers would be going to New York." (*Id.* at ¶ 96(B)(10).) Rubino next allegedly told Pollinger that he would take one of his days off in order to go to New York to assist. (*Id.*) "Pollinger became extremely angry ... [and] began yelling and screaming and pointing his finger in Rubino's face." (*Id.* at ¶ 96(B)(11).) At this point Pollinger allegedly ordered Rubino into his office, where more yelling occurred, until Pollinger finally relented and "allowed a small group of officers, including Rubino, to go to New York." (*Id.* at ¶ 96(B)(12).) We hold that Rubino's alleged speech interfered with Pollinger's ability to effectively deploy the police force in this time of crisis.

Rubino, a police officer, essentially claims that the First Amendment gives him the right to argue in the police station with his superior officer over how police officers should be deployed, without fear of retaliation. To recognize such a right, however, would be to license unfettered and unredressable dissension in government offices. The balancing test we employ to decide whether public employee speech is protected from retaliation is designed to avoid just such an outcome. Governmental offices are not democracies, least of all police departments. A public employee's limited right to speak is constrained by, *inter alia*, "whether the employee's comments were disruptive or had the potential for disruption." *Jakomas*, 229 F.Supp.2d at 420. Rubino's argument

---

**13.** Rubino's speech is no less a matter of public concern because it was allegedly uttered in Pollinger's office, rather than publicly disseminated, like Bradshaw's. *See Azzaro*, 110 F.3d at 977–78; *Costello v. City of Brigantine*, No. 99–4072, 2001 WL 732402, at *21 (D.N.J. June 28, 2001) ("The fact that a statement or position is not published or made public does not reduce the extent to which it is entitled to protection."). Nor do we agree with defendants' argument that Rubino's speech is not of public concern because he was speaking in his capacity as an employee, rather than as a member of the public. As noted *supra*, while the speaker's motivation for speaking may be relevant, the focus of the inquiry into whether Rubino's speech is protected is whether it relates to a matter of public concern. *See Azzaro*, 110 F.3d at 978.

with Pollinger over how the police should be deployed could have had serious repercussions for "discipline, morale, harmony, uniformity, and trust in the ranks" if Pollinger were unable to respond to it. *See Ober*, 80 Fed.Appx. at 200, 2003 WL 22596339, at *4. We therefore hold that Rubino's speech is not protected by the First Amendment against retaliation. Accordingly, we will grant the parts of the motions to dismiss the Amended Complaint insofar as it asserts this cause of action on behalf of Rubino against the individual defendants.

#### iv. *Weimer*

■ Weimer alleges the memo he wrote and submitted to Lieutenant Cerame was protected conduct. We hold that Weimer's speech is not on a matter of public concern. Like Bradshaw's speech pertaining to Morrell and the manure incident, the context and form of Weimer's speech demonstrate that he was doing nothing more than airing a personal grievance. *See* § II(a)(i) *supra.* While Morrell's alleged stalking of Weimer is reprehensible, Weimer's memo detailing the incident is not protected speech. Accordingly, Weimer has not stated a cause of action under Count 1 against any of the individual defendants. The motions to dismiss will be granted insofar as they seek to dismiss these claims.

#### b. *Count 2: Retaliation for Exercising the Right to Freedom of Association*

■ The First Amendment grants all citizens, including public employees, the right to freely associate with others without fear of retaliation. U.S. const. amend. I; *Smith v. Ark. State Highway Employees, Local 1315*, 441 U.S. 463, 465, 99 S.Ct. 1826, 60 L.Ed.2d 360 (1979) (per curiam) ("The public employee surely can associate ... freely ..., and he is protected by the First Amendment from retaliation for doing so.") This right extends to union-related activity. "Plainly efforts of public employees to associate together for the purpose of collective bargaining involve associational interests which the first amendment protects from hostile state action." *Labov v. Lalley*, 809 F.2d 220, 222–23 (3d Cir.1987). *See also Suppan*, 203 F.3d at 230–31, 236 (recognizing that First Amendment forbids government from retaliating against public employees for engaging in collective bargaining); *Robb v. City of Philadelphia*, 733 F.2d 286, 295 (3d Cir. 1984) (holding allegation that defendants retaliated against plaintiff for "exercis[ing] his rights of association through participation in his labor union ... sets forth the bare bones of a claim for which relief may be granted"); *McGrogan v. SEPTA*, No. 01–1342, 2002 WL 1586979, at *2 (E.D.Pa. July 19, 2002) (acknowledging that retaliation against public employee for participating in union election is forbidden by First Amendment).[14] To state a claim under § 1983, plaintiffs must allege instances of union activity for which they were retaliated against by persons acting under color of state law.

#### i. *Bradshaw*

■ The Amended Complaint does not allege that Bradshaw personally engaged

---

**14.** A split exists among the Courts of Appeal as to whether the "public concern" requirement imposed on analysis of public employee speech applies as well to public employee associational activity. The Third Circuit has yet to decide this issue. *See Sanguigni*, 968 F.2d at 400 (recognizing the circuit split but declining "to confront the issue whether [the public concern analysis] applies to claims involving the freedom of association"). This dispute does not affect this matter, however, because we hold that the two allegations of union activity properly alleged here, both by Dollinger, pertain to matters of public concern. *See* n. 15 *infra.*

in any union-related activity for which he suffered retaliation. Accordingly, the motions to dismiss will be granted insofar as the Amended Complaint asserts this cause of action on behalf of Bradshaw against defendants.

### ii. *Dollinger*

The Amended Complaint alleges two instances of union activity engaged in by Dollinger. First, Dollinger alleges that in his capacity as a member of the Board of Trustees of the PBA, he "took a stand" against Pollinger's proposal to change the police officers' uniforms and make the officers pay half the cost. (Am. Compl. at ¶ 96(A)(1)-(2).) Second, he alleges that "being a loyal union member" he was a named plaintiff in a Fair Labor Standards Act ("FLSA") lawsuit the PBA instituted against the Township. (*Id.* at ¶ 96(A)(6)-(8).) We hold that both of these claims allege that Dollinger engaged in protected conduct, as both allege involvement in union activity.[15]

Dollinger alleges nine instances of retaliation he suffered at the hands of Pollinger and Braun as a result of his engaging in union activities. *See supra.* As discussed in § II(a)(ii), *supra*, these claims allege conduct likely to deter a person of ordinary firmness from exercising rights guaranteed by the First Amendment. Accordingly, we hold that Dollinger has stated a claim for retaliation for engaging in the protected conduct of union activity against Pollinger and Braun. However, the Amended Complaint does not allege that Czech retaliated against Dollinger for his protected conduct. Thus, the motions to dismiss will be granted insofar as the

Amended Complaint alleges this cause of action against Czech.

### iii. *Rubino and Weimer*

The Amended Complaint does not allege that Rubino or Weimer personally engaged in any union-related activity for which they suffered retaliation. Accordingly, the motions to dismiss will be granted insofar as the Amended Complaint alleges this cause of action on behalf of Rubino and Weimer against the individual defendants.

### c. *Count 3: Retaliation for Exercising the Right to Petition the Government for a Redress of Grievances*

 The First Amendment guarantees "the right of the people . . . to petition the Government for a redress of grievances." U.S. const. amend. I. Citizens, including public employees, also enjoy the concomitant right to be free from government retaliation for exercising this right.

> [W]hen government—federal or state—formally adopts a mechanism for redress of those grievances for which government is allegedly accountable, it would seem to undermine the Constitution's vital purposes to hold that one who in good faith files an arguably meritorious "petition" invoking that mechanism may be disciplined for such invocation by the very government that in compliance with the petition clause has given the particular mechanism its constitutional imprimatur.

*San Filippo v. Bongiovanni,* 30 F.3d 424, 442 (3d Cir.1994). The petition need not

---

15. We also hold that both of these union activities pertain to matters of public concern. We held that Dollinger's speech regarding Pollinger's proposal was of public concern in § II(a)(ii) *supra.* The FLSA lawsuit was allegedly brought on behalf of all union members who had not been paid accumulated overtime hours, in violation of federal law. (Am. Compl. at ¶ 96(A)(6)-(9).) We hold that a suit of this type against the Township is a matter of public concern.

address a matter of public concern; the only requirement for protection from retaliation is that the petition be filed in good faith. "The mere act of filing a non-sham petition is not a constitutionally permissible ground for [adverse action against] a public employee." *Id.* at 443. *See also Dennison,* 268 F.Supp.2d at 399 (noting that to be protected by the Petition Clause, "[s]uch petitions need not be on a matter of public concern"); *Cooper,* 175 F.Supp.2d at 746 ("[A] public employee is protected against retaliation under the Petition Clause for filing a petition ... regardless of whether the petition addresse[s] a matter of public concern.").

■ The Petition Clause, however, only applies to petitions in the nature of a lawsuit or grievance. *San Filippo,* 30 F.3d at 442–43. If the conduct at issue "is not in the nature of a formal grievance procedure that the Petition Clause is designed to protect," then governmental retaliation is not constitutionally actionable. *Cooper,* 175 F.Supp.2d at 746. The Petition Clause encompasses conduct such as filing lawsuits and instituting union grievance proceedings. *See Dennison,* 268 F.Supp.2d at 399 (grievances filed with government bodies); *Marrero,* 164 F.Supp.2d at 468 (grievance filed with union); *Kadetsky,* 82 F.Supp.2d at 336 (grievance filed with union). Informal conduct such as letters, phone calls, memoranda and meetings, however, do not fall within the Petition Clause's purview. *Cooper,* 175 F.Supp.2d at 746.

### i. *Bradshaw*

Bradshaw alleges a number of instances of protected conduct that might be characterized as "petitioning." As detailed *supra,* he alleges seven instances of protected conduct arising out of the manure incident. These alleged actions, however, are not protected by the Petition Clause because they are not "petitions filed within sanctioned channels of redress." *Den-*

*nison,* 268 F.Supp.2d at 399. Rather, these alleged communications are just the types of informal conduct that fall outside the scope of the Petition Clause. *See Cooper,* 175 F.Supp.2d at 746. Accordingly, these allegations do not support Bradshaw's claim under Count 3.

■ Bradshaw also alleges that he was retaliated against by Pollinger after he informed Pollinger in September 2002 that he and the other plaintiffs would be bringing this lawsuit. Bradshaw alleges that Pollinger transferred him out of the Detectives Bureau within one week of learning of the plaintiffs' intentions. We hold that this allegation states a claim for retaliation for exercising rights protected by the Petition Clause. A public employee may not be retaliated against for bringing a lawsuit. *See, e.g., Zugarek,* 214 F.Supp.2d at 475; *Cipriani v. Lycoming County Hous. Auth.,* 177 F.Supp.2d 303, 324 n. 17 (M.D.Pa.2001) (observing "the petition clause of the First Amendment protects a public employee's right to pursue a lawsuit"). The prohibition applies equally to a public employee's announcement of an intention to file a lawsuit. *Anderson v. Davila,* 125 F.3d 148, 163 (3d Cir.1997). We further hold that Bradshaw may be able to prove a set of facts showing that a transfer from the Detective's Bureau is likely to deter a person of ordinary firmness from exercising the rights guaranteed by the First Amendment.

The Court will therefore deny the part of the motion seeking to dismiss the Amended Complaint to the extent it claims that Pollinger unlawfully retaliated against Bradshaw for exercising his right to petition the government for a redress of grievances. The Amended Complaint does not allege that either of the other individual defendants, Braun or Czech, retaliated against Bradshaw for his protected conduct. Accordingly, the separate motions

to dismiss will be granted insofar as the Amended Complaint asserts this cause of action against Braun and Czech on behalf of Bradshaw.

### ii. *Dollinger*

Dollinger alleges two instances of conduct that are protected under the Petition Clause. First, he alleges he participated in an FLSA suit against the Township. We hold that this allegation constitutes protected conduct for the same reasons that Bradshaw's declaration of his intent to bring an action is protected. *See* § II(c)(i) *supra.* Second, Dollinger alleges he filed a grievance contesting a letter of reprimand. We hold that this allegation, too, qualifies for protection under the Petition Clause. Though the Amended Complaint does not specify the nature of the process of which Dollinger allegedly availed himself, we hold that Dollinger could conceivably prove that he pursued this alleged grievance through a formal mechanism for redress.

We also hold that Dollinger has alleged that he was retaliated against by Pollinger and Braun for these alleged instances of protected conduct *See* §§ II(a)(ii) & (b)(ii) *supra.* Accordingly, we hold that Dollinger has stated a claim against Pollinger and Braun for retaliation for engaging in conduct protected by the Petition Clause. However, the Amended Complaint does not allege that Czech retaliated against Dollinger for his protected conduct. Thus, the motions to dismiss will be granted insofar as the Amended Complaint alleges this cause of action against Czech.

### iii. *Rubino and Weimer*

The Amended Complaint does not allege that either Rubino or Weimer was retaliated against for engaging in any conduct protected by the Petition Clause. Accordingly, the motions to dismiss will be granted insofar as the Amended Complaint asserts this cause of action on behalf of Rubino and Weimer against the individual defendants.

\* \* \*

We summarize the status of the Amended Complaint at this point. We have ruled as follows: Bradshaw has properly alleged a cause of action for Count 3 against Pollinger. Dollinger has properly alleged causes of action for Counts 1, 2 and 3 against Pollinger and Braun. Rubino and Weimer have not stated any claims upon which relief may be granted against any individual defendant.

### III. *Claims Against the Entity Defendants*

#### a. *Legal Standard*

Governmental entities such as the Township and the Police Department are "liable for any constitutional deprivations ... only if 'there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.'" *Brown v. Muhlenberg Township,* 269 F.3d 205, 214 (3d Cir.2001) (quoting *City of Canton v. Harris,* 489 U.S. 378, 385, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989)). We demand some degree of culpability flowing from the government entity, because "[l]iability under § 1983 may not be imposed on a theory of *respondeat superior.*" *Jakomas,* 229 F.Supp.2d at 427.

Governmental entity liability may be alleged in one of two ways. The entity may be liable "if it is alleged to have caused a constitutional tort through 'a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers.'" *City of St. Louis v. Praprotnik,* 485 U.S. 112, 121, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988) (quoting *Monell v. Dep't of Soc. Servs.,* 436 U.S. 658, 690, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978)). Liability may be alternatively alleged if there is a "causal link between the constitutional

deprivation and a custom, 'even though such a custom has not received formal approval through the body's official decision making channels.' " *Brown*, 269 F.3d at 215 (quoting *Monell*, 436 U.S. at 690–91, 98 S.Ct. 2018.) "A custom, or usage, of a State for § 1983 purposes must have the force of law by virtue of the persistent practices of state officials." *Brown*, 269 F.3d at 215 (quotations omitted).

■ The entity's liability under either theory must be predicated on acts for which it is actually responsible. As detailed above, this responsibility may be premised on an official policy, or a long-standing custom. It may also stem from a single act, however, so long as that act is performed by a person who has "final policymaking authority" for the governmental entity. *Praprotnik*, 485 U.S. at 123, 108 S.Ct. 915 ("[O]nly those municipal officials who have 'final policymaking authority' may by their actions subject the government to § 1983 liability.") That is, "an unconstitutional governmental policy could be inferred from a single decision taken by the highest officials responsible for setting policy in that area of the government's business." *Id.*

■ A variation of governmental entity liability is liability for "failure to train." *Brown*, 269 F.3d at 215 ("The official policy or adopted custom that subjects a municipality to § 1983 liability may relate to the training of police officers."). However, "[t]he scope of failure to train liability is a narrow one." *Id.* The Supreme Court has cautioned that "the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton*, 489 U.S. at 388, 109 S.Ct. 1197. To state a claim for failure to train liability, a plaintiff must allege not only that the government failed to train its officials in a certain way, but also that this failure evinced deliberate indifference toward the specific right that the plaintiff alleges was violated. *See Bd. of County Comm'rs v. Brown*, 520 U.S. 397, 409, 117 S.Ct. 1382, 137 L.Ed.2d 626 (1997) ("The likelihood that the situation will recur and the predictability that an officer lacking specific tools to handle that situation will violate citizens' rights could justify a finding that policymakers' decision not to train the officer reflected 'deliberate indifference' to the obvious consequence of the policymakers' choice—namely, a violation of a specific constitutional or statutory right.").

### b. *Policymaker Liability*

■ Plaintiffs allege in Counts 1, 2 and 3 that the Township and Police Department are liable for the retaliatory acts plaintiffs suffered. However, plaintiffs do not allege any custom or policy that could form the basis for the Township and Police Department's liability. Instead, plaintiffs allege the entity defendants are liable under the policymaker theory recognized by the Supreme Court in *Praprotnik*.

We hold that plaintiffs state a claim for governmental liability under this theory. First, as discussed *supra*, Dollinger has properly alleged a claim that he was retaliated against by Pollinger and Braun for engaging in protected speech. Dollinger has also properly alleged a claim that he was retaliated against by Pollinger and Braun for engaging in union activities. And Bradshaw and Dollinger have stated claims for retaliation for filing petitions for a redress of grievances against Pollinger (both Bradshaw and Dollinger) and Braun (Dollinger only). Second, the Amended Complaint alleges that both Pollinger and Braun are policymakers for the Township and for the Police Department. (Am. Compl. at ¶¶ 12–13.) Thus, we hold that Bradshaw has properly alleged govern-

mental entity liability under § 1983 for actions taken by a policymaker as to Count 3 of the Amended Complaint. Dollinger has alleged governmental entity liability as to Counts 1, 2 and 3. Rubino and Weimer, who have not alleged that anyone violated their constitutional rights, have not properly alleged governmental liability for Counts 1, 2 or 3.

### c. *Failure to Train Liability*

 Plaintiffs alternatively allege in Count 4 that the Township is liable for its failure to train the police officers who committed the constitutional violations. The Amended Complaint does not allege, however, that "the need for more or different training was so obvious and so likely to lead to the violation of constitutional rights that the [Township's] failure to respond amounts to deliberate indifference." *Brown*, 269 F.3d at 216. "A plaintiff pressing a § 1983 claim must identify a failure to provide specific training that has a causal nexus with their injuries and must demonstrate that the absence of that specific training can reasonably be said to reflect a deliberate indifference to whether the alleged constitutional deprivations occurred." *Reitz v. County of Bucks*, 125 F.3d 139, 145 (3d Cir.1997). Plaintiffs' failure to train allegations, which are entirely conclusory, do not sufficiently state a claim against the Township on Count 4. (*See* Am. Compl. at ¶ 97.) Accordingly, Count 4 will be dismissed.[16]

## III. *Defenses*

Defendants assert two defenses in support of their motions to dismiss the Amended Complaint. Both are unavailing at this stage of the litigation.

### a. *Qualified Immunity*

Defendants first assert that the individual defendants are entitled to qualified immunity. Qualified immunity provides government officials a measure of insulation from damages suits arising out of their official duties, as such suits "can entail substantial social costs, including the risk that fear of personal monetary liability and harassing litigation will unduly inhibit officials in the discharge of their duties." *Anderson v. Creighton*, 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987). Officials are shielded "from civil damages liability as long as their actions could reasonably have been thought consistent with the rights they are alleged to have violated." *Id.* Qualified immunity "is an *immunity from suit* rather than a mere defense to liability." *Mitchell v. Forsyth*, 472 U.S. 511, 526, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). Accordingly, the applicability of the doctrine should ideally be resolved early on in litigation "to spare a defendant not only unwarranted liability, but unwarranted demands customarily imposed upon those defending a long drawn out lawsuit." *Siegert v. Gilley*, 500 U.S. 226, 232, 111 S.Ct. 1789, 114 L.Ed.2d 277 (1991).

The qualified immunity inquiry is twofold. First, we must ask whether the "the facts alleged show the [defendant's] conduct violated a constitutional right.... [I]f a violation could be made out ..., the next, sequential step is to ask whether the right was clearly established." *Saucier v. Katz*,

---

**16.** The Amended Complaint might be read to allege that the Township's failure to train is causally linked to Morrell's mailing of the manure to plaintiffs. (*See* Am. Compl. at ¶¶ 46, 48, 94.) Even if we interpreted the Amended Complaint this way, however, the Township could not be liable for Morrell's actions. The Township is not constitutionally obligated to prevent Morrell from taking actions outside the scope of his duty as a police officer. Nor do plaintiffs have a constitutional right to be free from private citizens mailing them packages of manure, although the postal service might have an interest in deterring such conduct.

533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001). To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson*, 483 U.S. at 640, 107 S.Ct. 3034.

We hold that the individual defendants may not avail themselves of the qualified immunity defense at this stage in the action. First, plaintiffs have asserted a constitutional violation: that their rights to be free from retaliation for exercising three types of conduct protected by the First Amendment have been violated. Second, this right is clearly established. *Baldassare*, 250 F.3d at 201. *See also Atkinson v. Taylor*, 316 F.3d 257, 269–70 (3d Cir. 2003) (right to be free from retaliation for exercising right to petition for redress); *Larsen v. Senate of Commonwealth of Pa.*, 154 F.3d 82, 95 (3d Cir.1998) (right to be free from retaliation for engaging in protected speech); *Hitchens v. County of Montgomery*, No. 00–4282, 2002 WL 253939, at *8 (E.D.Pa. Feb. 20, 2002) (right to be free from retaliation for engaging in union activities).

■■■ A qualified immunity determination in the special context of First Amendment retaliation claims ultimately

> turns on an inquiry into whether officials reasonably could believe that their motivations were proper even when their motivations were in fact retaliatory. Even assuming that this could be demonstrated under a certain set of facts, it is an inquiry that cannot be conducted without factual determinations as to the officials' subjective beliefs and motivations, and thus cannot properly be resolved on the face of the pleadings, but rather can be resolved only after the plaintiff has had an opportunity to ad-

duce evidence in support of the allegations that the true motive for the conduct was retaliation.

*Larsen*, 154 F.3d at 94. Like the *Larsen* court, "we must accept [plaintiffs'] allegations that [defendants'] true reasons were retaliatory, allegations which state a claim for violation of clearly established rights under the First Amendment, precluding dismissal on qualified immunity grounds." *Id.* at 95.[17]

### b. Preemption and Exhaustion

■■■ Defendants curiously suggest that plaintiffs' § 1983 claims, brought under federal law, are preempted by New Jersey state law. In fact, the Township defendants' overlong brief in support of its motion to dismiss devotes a full seventeen pages to this proposition. We dispose of this far-fetched argument quickly. State law cannot preempt federal law; if the two conflict, it is the state law, not the federal, that is preempted. U.S. const. art. VI, cl. 2. Defendants alternatively assert that plaintiffs failed to exhaust available state remedies, which defendants assert is a predicate to a § 1983 action. This contention is also without merit. Absent specific circumstances not present here, plaintiffs need not exhaust state remedies before instituting a § 1983 action. *Felder v. Casey*, 487 U.S. 131, 146–51, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988); *Patsy v. Bd. of Regents*, 457 U.S. 496, 500–01, 102 S.Ct. 2557, 73 L.Ed.2d 172 (1982).

### CONCLUSION

The Amended Complaint alleged five causes of action by four individual plaintiffs against six separate defendants, and an additional cause of action on behalf of six individual plaintiffs against those same

---

**17.** We express no opinion, however, as to the applicability of the qualified immunity defense at a later stage of this matter.

six defendants. In sum, the Amended Complaint alleged 156 causes of action. After much effort was expended in a semi-fruitful attempt to understand what, exactly, the Amended Complaint purports to claim, and then analyzing those claims under the 12(b)(6) standard, we have refined that figure down to fifteen separate causes of action, involving only two plaintiffs, and four defendants. We sincerely hope that litigation counsel will think twice before burdening another court with a like task of having to search for the needle of a properly pleaded cause of action in a haystack of baseless claims and irrelevant allegations.

We hold as follows in ruling upon this motion. On Count 1, retaliation for exercising the right to freedom of speech, Dollinger states a claim for relief against Pollinger, Braun, the Township and the Police Department. On Count 2, retaliation for exercising the right to freedom of association, Dollinger states a claim for relief against Pollinger, Braun, the Township and the Police Department. On Count 3, retaliation for exercising the right to petition the government for a redress of grievances, Dollinger states a claim for relief against Pollinger, Braun, the Township and the Police Department, while Bradshaw states one against Pollinger, the Township and the Police Department. Counts 4, 5 and 6 will be dismissed. All claims made by Rubino, Weimer, Christine Weimer and Nina Rubino will be dismissed. All claims made against Morrell and Czech will be dismissed.

An order to show cause why the claims made by Dollinger should not be severed from those made by Bradshaw under Rule 21 will also be issued by the Court. Rule 21 permits a court on its own motion to sever the claims of plaintiffs who are misjoinded into separate actions. Fed.R.Civ.P. 21. "Rule 21 is most commonly invoked to sever parties improperly joined under Rule 20." *Norwood Co. v. RLI Ins. Co.*, No. 01–6153, 2002 WL 523946, at *1 (April 4, 2002). *See also Miller v. Hygrade Food Prods. Corp.*, 202 F.R.D. 142, 143–44 (E.D.Pa.2001) (observing that courts will sever plaintiffs under Rule 21 if they are improperly joined under Rule 20). Rule 20 permits one or more plaintiffs to join in a single action only where "they assert any right to relief ... in respect of or arising out of the same transaction, occurrence, or series of transactions or occurrences." Fed.R.Civ.P. 20(a). The events giving rise to Bradshaw's remaining claim against Pollinger, the Township and the Police Department appear to have no relationship to those forming the basis of Dollinger's various claims.

An appropriate order and order to show cause will accompany this Memorandum Opinion.